**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,**

v.

**STERLING PRECISION CORPORATION, Defendant-Appellee,**
**and**
**The Equity Corporation, Defendant.**

**No. 225, Docket 31729.**

United States Court of Appeals
Second Circuit.

Argued Feb. 20, 1968.

Decided March 26, 1968.

Rehearing Denied April 29, 1968.

---

4.  See 18 F.R. 3499.

Walter P. North, Associate Gen. Counsel (Philip A. Loomis, Jr., Gen. Counsel, Meyer Eisenberg, Ass't Gen. Counsel, David J. Myerson and Edward L. Lublin, Washington, D. C., Attorneys), for plaintiff-appellant.

Milton V. Freeman, Washington, D. C. (Palmer & Serles, New York City; William A. Metz, James P. O'Neill, New York City, Arnold & Porter, Werner J. Kronstein, Washington, D. C., of counsel), for The Equity Corporation.

Simon H. Rifkind, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Paul J. Newlon and John E. LeMoult) New York City (Friedman, Koven, Salzman, Koenigs-

berg, Specks & Homer, Chicago, Ill., of counsel), for Sterling Precision Corporation.

Before FRIENDLY and SMITH, Circuit Judges, and GIGNOUX, District Judge.*

FRIENDLY, Circuit Judge:

The primary issue on this appeal from an order of the District Court for the Southern District of New York granting summary judgment to defendant Sterling Precision Corporation in an injunction action by the SEC is whether Sterling's redemptions of its bonds and preferred stock were a "purchase" of such securities by Sterling from The Equity Corporation, a registered investment company owning more than 5% of Sterling's voting securities, within the ban of § 17(a) (2) of the Investment Company Act. We hold they were not.

As a result of transactions ten years earlier, the details of which need not be stated in the view we take of the case, Equity, on August 9, 1966, owned $1,637,000 of Sterling's 4½% Convertible Debentures due January 1, 1971, and 355,052 of 374,826 outstanding shares of Sterling's $10 par value 5% Cumulative Convertible Preferred Stock. Equity's holdings of preferred stock and of 120,340 common shares out of 3,600,-000 outstanding constituted 11.8% of the voting securities of Sterling, and made Sterling "an affiliated person" of Equity under § 2(a) (3) (B).

The Debentures provided, with qualifications not here material, that 4% of the total then outstanding should be called for redemption on March 15 of each year at their principal amount plus accrued interest. It was provided also that on special notice the Debentures might be redeemed at the same price as a whole at any time or in part from time to time; in the latter event re-

demption was to be made pro rata. The Series C Preferred Stock was redeemable at $10 per share plus dividends accrued and unpaid; if less than all the stock was called for redemption, "the shares to be so redeemed shall be selected by lot or in such manner as the Board of Directors may determine * * *." The indenture under which the Debentures were issued contained a covenant that Sterling would not redeem any stock without the consent of holders of 60% of the outstanding Debentures except out of the net amount of earnings and the proceeds of sales of stock since January 1, 1956; breach of this covenant would give the holders of Debentures the option to declare them immediately due and payable.

In 1966 Sterling found itself with a large cash balance of about $7,700,000, constituting some 35% of its total assets. Its management proposed a program whereby these funds would be used in part to redeem the Debentures and Preferred Stock held by Equity, thereby terminating the affiliation, which Sterling regarded as a handicap to its operations. At a meeting on August 4, 1966, the directors authorized the officers to negotiate with the other two Debenture holders for their consent. On August 8, the Chairman reported that such consent would be forthcoming in consideration of an increase in the interest rate to 6% and possibly the issuance of warrants to purchase not more than 300,000 shares of common stock. The Board thereupon called Equity's Debentures and Preferred Stock for redemption on October 1, 1966;[1] Equity waived notice and surrendered its securities for redemption on August 9. Due to subsequent quintupling of the market price of its common stock, the transaction has proved beneficial to Sterling; as against the total redemption price of $5,191,379, the stock into which Equity's Debentures and Preferred Stock would have

---

* Of the District Court of Maine, sitting by designation.

1. Counsel had given Sterling an opinion that the transaction was not within § 17(a) (2) of the Investment Company Act and thus did not require an exemption under § 17(b).

been convertible had a market price of over $14,000,000 on January 4, 1968.

Section 17(a) of the Investment Company Act provides:

"It shall be unlawful for any affiliated person or promoter of or principal underwriter for a registered investment company (other than a company of the character described in section 12(d) (3) (A) and (B)), or any affiliated person of such a person, promoter, or principal underwriter, acting as principal—

"(1) knowingly to sell any security or other property to such registered company or to any company controlled by such registered company, unless such sale involves solely (A) securities of which the buyer is the issuer, (B) securities of which the seller is the issuer and which are part of a general offering to the holders of a class of its securities, or (C) securities deposited with the trustee of a unit investment trust or periodic payment plan by the depositor thereof;

"(2) knowingly, to purchase from such registered company, or from any company controlled by such registered company any security or other property (except securities of which the seller is the issuer) * * *."

■ We start our consideration from the point that in common speech a maker's paying a note prior to maturity in accordance with its terms would not be regarded as a "purchase." While few people would find it necessary to resort to a dictionary to ascertain the meaning of that term, Webster's International Dictionary (2d ed. 1960) tells us that "purchase" means "the acquisition of title to, or property in, anything for a price; buying for money or its equivalent," and that to purchase is to "obtain (anything) by paying money or its equivalent." Sterling did not acquire title to its Debentures or Preferred Stock; it discharged them. Perhaps more important, the normal discourse of lawyers sets redemptions apart from purchases. The distinction is recognized in corpora-

tion statutes, notably that of Delaware, where Sterling was organized, General Corporation Law § 243; by judicial decision, see Venner v. Public Utilities Commission, 302 Ill. 232, 235, 134 N.E. 17, 18 (1922), compare Starring v. American Hair & Felt Co., 21 Del.Ch. 380, 191 A. 887 (1934), aff'd 21 Del. Ch. 431, 2 A.2d 249 (Sup.Ct.1938) with Martin v. American Potash & Chemical Corp., 33 Del.Ch. 234, 92 A.2d 295, 301–302, 35 A.L.R.2d 1140 (Sup.Ct.1952); and by writers on corporation law, see Henn, Corporations 170 & n. 37 (1961); Ballantine, Corporations § 263 (1946). Indeed, only a year before the Investment Company Act was adopted, the Supreme Court had said, in upholding a contention by the Government that the redemption of debentures was not a "sale or exchange" affording the benefit of capital gains treatment under the revenue laws:

"Payment and discharge of a bond is neither sale nor exchange within the commonly accepted meaning of the words."

United States v. Fairbanks, 306 U.S. 436, 437, 59 S.Ct. 607, 608, 83 L.Ed. 855 (1939).

■ We recognize these considerations are not conclusive. A statute, particularly one dealing with an esoteric subject, may sometimes use a word in a sense different from that supplied by the dictionary or common usage. Cf. NLRB v. Coca-Cola Bottling Co., 350 U.S. 264, 269, 76 S.Ct. 383, 100 L.Ed. 285 (1956). The SEC is right in saying we should decide the issue as one of federal law, even though a Delaware court construing its corporation laws might come to a different conclusion. SEC v. Variable Annuity Life Ins. Co., 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959); Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). It is true also that "sale" may have a broader meaning in securities legislation than in the Internal Revenue Code. Still, when due allowance has been made for all this, a good deal remains from what we first said. "Pur-

chase" is not a peculiarly technical term and "[a]fter all, legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him." Addison v. Holly Hill Fruit Products Inc., 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944). A party asserting that a word in a statute should be given a meaning different from what it has in the speech of common men or, in this instance, the common speech of lawyers, has the burden of showing that context or evident purpose requires this.

When we turn to context, we find the SEC's burden increased rather than diminished. While the Investment Company Act defines "sell" in quite inclusive terms, § 2(a) (33), it contains no definition of "purchase," and in several provisions, §§ 1(a) (1), 7(a) (2), 7(b) (2), 18(e) (2), and 22, Congress referred to redemptions as well as "purchases." While some of these instances, e. g., § 22, are explicable in terms of the practice of open-end investment companies to redeem their own shares on demand, that consideration would not apply, for example, to § 18(e) (2) which renders the restrictions of that section on the sale of senior securities by registered closed-end companies inapplicable, with a qualification not here material, to such securities sold for the purpose of refunding another senior security through "payment, purchase, redemption, retirement, or exchange." It can be argued, as the SEC does, that Congress here lapsed into the old-fashioned method wherein a draftsman would never use one word if five would do as well. Still, if the draftsman of § 18(e) (2) was not sure that "purchase" included redemption, there is legitimate ground for wonder how we can assume the draftsman of § 17(a) (2) was confident of the opposite, especially when such a construction runs counter to the ordinary meaning of the words.

When we turn to purpose, we find the legislative history silent on the specific question here at issue. Making our own guesses as best we can, we would think it plain that Congress could not have meant to include all redemptions in § 17(a) (2), as it did all purchases. The clearest case is a compulsory redemption, such as Sterling was required to perform annually with respect to 43% of the Debentures then outstanding. Congress surely did not intend that an investment company's acquisition of more than 5% of the stock of a non-investment company should place the latter under the necessity of applying to the Commission for exemption of a transaction necessary to avoid a default. We are equally confident that Congress would not have meant to include total redemptions or *pro rata* ones, even though at the volition of an "affiliate" not an investment company. Though Congress was principally concerned with protecting the assets of investment companies from unscrupulous management, it nevertheless permitted affiliates to "sell" back investment company securities without SEC approval, § 17(a) (1) (A), and the Commission concedes that this exemption includes redemptions by the investment company. If Congress believed that redemptions of this type could safely be left unsupervised, it follows *a fortiori* that redemptions by "affiliates" in substantial accordance with the terms of their securities should also be. For in cases of this sort there is no danger that the investment company could be unfairly prejudiced. When it bought the securities, it did so with the recognition that they were subject to call; thus, the only potential evil arising out of the transaction is that the investment company might influence its "affiliate" to make a call, to the detriment of the other security holders in the non-investment company. While the danger of such influence was recognized at the time the Act was passed, see SEC Study of Investment Trusts and Investment Companies, parts 4 and 5, H.Doc. 246,

77 Cong., 1st Sess. pp. 27–8 et passim (1942),[2] it was not one of the principal evils the Act sought to remedy, see Wharton School Study of Mutual Funds, H.Rep. 2274, 87 Cong., 2d Sess., pp. 400–04 (1962).[3] Indeed, the elaborate declaration in § 1(b) of the evils which the statute sought to prevent does not contain an express declaration of Congressional concern with this danger. Section 1(b) (2), which the SEC emphasizes, reads on the kind of "affiliated person" who is able to injure the investment company rather than the reverse. We cannot believe that, in the name of this low priority policy, Congress would have desired the Commission to police redemptions by non-investment companies more thoroughly than redemptions by investment companies which involved dangers with which it was primarily concerned. While none of these considerations would justify a failure to apply § 17(a) to transactions within its terms, Blau v. Mission Corp., 212 F.2d 77 (2 Cir.), cert. denied, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954),—as to which the Commission is required, § 17(b) (2), to make sure that the transaction does "not involve overreaching on the part of any person concerned"—they argue powerfully against

the general expansion here urged upon us.

■ Rejection of the SEC's broad position that "purchase" in § 17(a) (2) includes all redemptions brings us to the narrower issues whether the statute includes some redemptions that arguably have the essential quality of a purchase and, if so, whether the non-*pro rata* character of those here at issue—perhaps more accurately of the redemption of the Debentures[4]—suffices to meet that test. The issue is narrowed still further by the concession of Sterling's counsel, which we accept as in accordance with the ordinary use of language, that acquisition of bonds for less than the redemption price would be a "purchase," even though the acquirer then cancelled them; discharge through payment is effected only when a security is paid off in substantial accordance with its terms.

■ Sterling and Equity argue that in fact there was no departure from the governing provisions of the Debentures at all. Equity, they say, could not have refused to accept the non-*pro rata* redemption since in their view that requirement was solely for the benefit of holders whose Debentures would otherwise not be redeemed. While we join the Commission in believing that the

2. The SEC's brief also cites testimony by David Schenker, Esq., chief counsel of its Investment Trust Study, Hearings on S. 3580 before a subcommittee of the Senate Committee on Banking and Currency, 76th Cong. 3d Sess. (1940), 257–59, where he discussed the possible evils of an investment company causing one controlled subsidiary to engage in transactions with another.

3. Later studies sponsored by the Commission suggest that investment companies have not seriously abused their power over "affiliates." The Wharton School's Study, supra, found that mutual fund managers participate in the affairs of portfolio companies in only very limited ways. Id. at 26–27. The most recent Commission Report, Public Policy Implications of Investment Company Growth, H.R. 2337, 89 Cong., 2d Sess. at 308–09 (1966), while indicating that the Wharton School Study's findings in this area may be obsolete in view of the 300%

increase in the size of the funds, did not undertake a new in-depth analysis at this time since "there is no evidence as yet of any widespread departure from the traditional [investment company] policy of evidencing disapproval of portfolio company management by liquidating holdings." Id. at 310.

4. Since the directors had complete freedom to determine which preferred shares were to be redeemed, it was unnecessary to get the consent of Equity *qua* preferred stockholder or of the other preferred stockholders in order to effect the the redemption of Equity's preferred stock. Once Equity's Debentures were redeemed, it could not take advantage of the clause which made a stock redemption an event of default under certain circumstances in the absence of consent by 60% of the Debenture holders—even if the clause was here applicable, which the record does not reveal.

holder of a Debenture could object to a non-*pro rata* redemption since this might deprive him of a high interest rate or prematurely terminate a conversion privilege, such a right would not have been very valuable to Equity from a practical standpoint. For we know of no principle that would have prevented Sterling from making a complete redemption in accordance with the indenture and then reborrowing from the holders whose bonds it had not wished to redeem, on such terms as might be agreed. We find it hard to think that the 1940 Congress would have been greatly concerned over an investment company like Equity receiving the full redemption price simply because other bondholders ultimately might make out better still, especially when, as indicated, Sterling could so readily have accomplished this by available means which the statute clearly did not prevent. Consequently we find that the transaction's deviation from the terms set out in the Debenture was not so substantial as to transform it into a "purchase."

■ There remains only the contention that for over twenty years the Commission has considered § 17(a) (2) to cover redemptions, even when these were total, see In the Matter of Atlas Corporation, 23 S.E.C. 43 (1946), or pursuant to a sinking fund requirement, see In the Matter of Bankers Securities Corporation, 25 S.E.C. 325 (1947), unless the redemptions were within the exemption established by Rule 17a–4 in 1947. In both these cases the applicants voluntarily sought exemption under § 17(b), the applicability of § 17(a) being simply assumed, and the exemption issued. Uncontested administrative construction of this nature carries relatively little weight. Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 290, 66 S.Ct. 1105, 90 L.Ed. 1230 (1945); Skidmore v. Swift & Co., 323 U.S. 134,

140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Cf. Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968).

In light of our view on the major issue of construction presented, we find it unnecessary to consider other grounds for affirmance urged by Sterling and Equity.

Affirmed.

### On Petition for Rehearing

PER CURIAM.

■ The principal point made in the SEC's petition for rehearing concerns the inference we drew, 393 F.2d at 218, from the exemption in § 17(a) (1) of the Investment Company Act which, even on the broad reading urged by the Commission, would cover a redemption by an investment company of its own securities held by an affiliate. The Commission argues that the exemption is explicable in light of the general provisions relating to redemptions of such securities and related matters in §§ 22 and 23.[1] However, inspection of these provisions, notably § 23(c), shows that even if "purchase" were read to cover a redemption as the Commission contends, Congress established only certain basic safeguards and did not require Commission approval. The Commission's explanation of this on the basis that these provisions cover all transactions and not simply those with affiliates reinforces the view that Congress did not regard affiliation as calling for special treatment of redemptions. Our inference that if Congress did not require SEC approval of a transaction of the sort with which the Act was primarily concerned—in this instance an affiliate's causing an investment company to redeem its own securities held by the affiliate, it could hardly have meant to require such approval in the lower priority area of redemption of non-

---

1. The "redeemable securities" dealt with in § 22 are securities "under the terms of which the holder, upon its presentation to the issuer or to a person designated by the issuer, is entitled (whether absolute- ly or only out of surplus) to receive approximately his proportionate share of the issuer's current net assets, or the cash equivalent thereof." § 2(31).

investment company securities, thus remains unimpaired.

■ After careful study of the Commission's petition, we remain unconvinced that Congress was concerned over an investment company receiving the full redemption price specified in a security of an affiliate even when the affiliation stems from ownership by the affiliate in the investment company and *a fortiori* when, as here, the affiliation arises from the investment company's ownership in the affiliate. In the absence of clear evidence of contrary purpose, such as we found to exist in FMC v. DeSmedt, 366 F.2d 464, 469–470 (2 Cir.), cert. denied, 385 U.S. 974, 87 S.Ct. 513, 17 L.Ed.2d 437 (1966), the words of Congress should be applied in their ordinary sense. If the problem here presented requires a remedy, which nothing in the record suggests, proposals for modification of the Investment Company Act now pending before Congress will provide an appropriate vehicle for an amendment more closely tailored to the asserted danger than the broad reading for which the SEC argues.

The petition for rehearing is denied.