Florence K. LEVINE, as Executrix of the Last Will and Testament of Irving Levine, Deceased, Plaintiff-Appellant,

v.

SEILON, INC., Defendant-Appellee.

No. 379, Docket 35226.

United States Court of Appeals, Second Circuit.

Argued Jan. 13, 1971.

Decided March 1, 1971.

Stanley Nemser, New York City (Mortimer A. Shapiro, Nemerov & Shapiro, and Nemser & Nemser, New York City, of counsel), for plaintiff-appellant.

William S. Greenawalt, New York City (James B. Weidner, Royall, Koegel & Wells, New York City, of counsel), for defendant-appellee.

Theodore Sonde, Asst. Gen. Counsel, S.E.C. (Philip A. Loomis, Jr., Gen. Counsel, Walter P. North, Associate Gen. Counsel, S.E.C., Washington, D. C., of counsel), for Securities and Exchange Commission as amicus curiae.

Before WATERMAN, FRIENDLY and KAUFMAN, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal from an order of the District Court for the Southern District of New York, dismissing a stockholder's complaint against a corporation for failure to state a claim upon which relief can be granted, F.R.Civ.P. 12(b) (6), presents a novel contention which again demonstrates the astonishing inventiveness of counsel in invoking the SEC's Rule 10b–5 issued pursuant to § 10(b) of the Securities Exchange Act, and a related claim for the same relief under § 14(e) added to the Act in 1968. The arguments have taken an exceedingly wide range; indeed, the SEC as *amicus* urges that we utilize this un-usual case as a vehicle for overruling the purchaser-seller requirement of Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2 Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), despite our several recent refusals to do so, see, e. g., Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2 Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970). We find it unnecessary to consider most of these arguments since affirmance is required even if we were to assume *arguendo* that most of appellant's contentions are correct.

Although this appeal questions the dismissal both of the original complaint —with leave to amend as to the § 10(b) and Rule 10b–5 claim but not as to the § 14(e) claim—and of the amended one, it will be convenient to state the case in terms of the amended complaint, which is fuller and better pleaded. It will also simplify matters if we disregard the death of the original plaintiff, Irving Levine, and the substitution of Mrs. Levine, his executrix.

On May 31, 1968, defendant Seilon, Inc., a Delaware corporation, had outstanding 1,438,121 shares of Common, 12,521 shares of Prior Preferred carrying a $4.50 cumulative dividend, 18,-792 shares of Class A Preferred stock, with a $5.00 cumulative dividend, and 31,238 Common Stock Warrants. The Common was traded on the New York Stock Exchange. The Prior Preferred was redeemable at any time at $100 per share and the Class A Preferred at $102, in each instance together with unpaid accumulated dividends. Neither class of preferred carried a conversion privilege. Levine owned 500 shares of Class A Preferred from May 1965 until the redemption in January 1969, of which more hereafter.

Seilon's certificate of incorporation contained various restrictions for the benefit of the preferred stockholders. Without the affirmative vote at a meeting or the written consent with or without a meeting of two-thirds of the Prior Preferred shares, Seilon could not take

any of the acts set forth in the margin.[1] Without like vote or consent of both classes of preferred, it could not take action of the sort described in the accompanying footnote.[2]

The amended complaint alleged that about June 6, 1968, Seilon conceived a fraudulent scheme to acquire all the preferred stock by redemption so as to release itself from these restrictions. The fraudulent scheme was allegedly necessitated by the fact that "Seilon on said date did not have sufficient cash funds available or obtainable for said redemption." Thus, the amended complaint continued,

"In order to induce the said preferred stockholders to consent to the creation of new funded debt and to proceed thereafter with a program to create additional new funded debt for acquisitions of interests in other companies and the public sale and issuance of stock by its subsidiaries, Seilon publicly announced and represented to its preferred stockholders on or about June 6, 1968 and thereafter until December 10, 1968, that it would honor the commitment previously made to give the preferred stockholders of Seilon the opportunity to exchange their preferred shares for Common shares of Seilon; that the Board of Directors had authorized Seilon to proceed with an exchange offer to exchange shares of its Common Stock for all of the outstanding preferred stock; that Seilon would not call any of said preferred shares for redemption prior to the effectiveness of said exchange offer and the termination of the period to accept said offer; and that it was required to and would register under the Securities Act of 1933 a sufficient number of shares of Common Stock to effect the exchange at the publicly announced ratio of 6½ shares of Common Stock for each share of preferred stock (Prior Preferred and Class A Preferred) under the invitation for Tenders."

All of these representations, the complaint alleged, were false and misleading since Seilon's real intention was to sell its stockholdings in certain subsidiaries and the assets of certain of its divisions in order to raise the cash needed for the redemption. Seilon, we are told, never intended to make effective the invitation to the preferred stockholders to exchange their shares for common stock.

The amended complaint proceeded to allege that although the preferred shareholders had earlier declined to approve the creation of new funded debt, "Seilon [by means of these misrepresentations]

1. (1) sell, lease, transfer or convey all or substantially all of its property or business or any portion thereof essential to the Corporation or its business or part with control thereof, or voluntarily liquidate, dissolve, or wind up its business;

(2) consolidate or merge any subsidiary with or into any company, other than Seilon or another subsidiary, or merge any company, other than Seilon or another subsidiary, into any subsidiary;

(3) permit any subsidiary to issue, other than to Seilon or a wholly-owned subsidiary, any shares of stock of any subsidiary, with certain exceptions specified therein; or

(4) sell or otherwise dispose of, other than to Seilon or to a wholly-owned subsidiary, any outstanding shares of stock of any subsidiary, unless there shall contemporaneously be sold or otherwise disposed of all outstanding shares of stock of such subsidiary then owned by Seilon and its subsidiaries.

2. (1) create any mortgage on or pledge of any of its property, or permit any subsidiary to create any mortgage on or pledge of any of its property, unless all the indebtedness secured thereby be acquired and held by Seilon or a subsidiary, except for purchase money mortgages on after-acquired property, pledges of current assets in the ordinary course of business, or deposit of current assets in connection with workmen's compensation laws or excise tax requirements; or

(2) create, issue, incur, assume or guarantee any funded debt, or permit any subsidiary so to do, except that Seilon or any subsidiary without such consent may refund an equal or greater amount of such funded debt.

fraudulently induced the Prior Preferred and Class A Preferred stockholders to give their requisite two-thirds consent on June 21, 1968 to new credit arrangements for Seilon, which Seilon entered into on or about July 8, 1968." The complaint, however, did not further identify these "new credit arrangements." Other paragraphs alleged various transactions by Seilon, none of which are claimed to have required or to have received the consent of the preferred stockholders:

1) About June 28, 1968, Seilon sold its stock in Copolymer Rubber & Chemical Corporation, which had been pledged to John Hancock Mutual Life Insurance Company, for $5,500,000. Seilon applied $1,981,878 to notes payable to banks and $445,709 to accounts payable to Copolymer. The balance, $3,072,413, was pledged with John Hancock in place of the Copolymer stock.

2) In June, 1968, Seilon transferred the assets of its Lockwood Division to a newly organized subsidiary, Lockwood Corporation, for 1,000,000 shares of the latter's Class A stock.

3) About October 21, 1968, Seilon sold certain assets of its Plastics Division for $2,400,000. Of this, $400,000 was used to reduce the accounts payable of the Plastics Division. As a result of this sale Seilon's cash balance, excluding the amount pledged with John Hancock, was $2,017,542, an amount insufficient to redeem the preferred stock.

About September 10, 1968, Seilon filed a Form S-1 Registration Statement with the SEC in respect of 203,-534 shares of Common Stock, to be offered in exchange for the preferred in a ratio of 6½ shares to one. The common stock had attained a price of 21⅜ on September 6 and stayed in that general area through the December redemption announcement; the market prices of the preferred stocks advanced to reflect the anticipated exchange. Seilon represented in the Registration Statement that it did not intend to call any preferred stock prior to the expiration of the invitation for tenders, which it proposed to commence as soon as practicable after the registration had become effective.[3]

Seilon also caused Lockwood to file, about September 27, a Form S-1 Registration Statement for the public sale and issuance of an unstated amount of common stock—the actual issuance of which would apparently be prohibited without the affirmative vote or written consent of the Prior Preferred, see fn. 1, item (3). As we read the complaint and appellant's brief, this had not been given. Thereupon, Seilon arranged with John Hancock to substitute as security Seilon's holdings of Lockwood stock in lieu of the $3,072,413 previously pledged as collateral to replace the Copolymer stock. With the cash needed for the redemption thus in hand, Seilon, about December 10, 1968, announced a call of both classes of preferred and an intention to make a public offering of the common shares then in course of registration. The amended complaint concluded by alleging that

"The plaintiff and all the other members of the class were either misled into retaining their preferred stock of Seilon which they could have sold at a substantially higher price than the redemption acquisition price, or were misled into purchasing Prior Preferred and Class A Preferred during the period between June 6, 1968 and December 9, 1968, and upon such purchases were misled into retaining said preferred shares so purchased which they could have resold at a substantially higher price than

---

3. By virtue of § 3(a) (9) of the 1933 Act the registration was unnecessary if truly intended as an exchange offer unless Seilon was to pay a commission or other remuneration for soliciting the exchange.

the redemption acquisition price; * * * " 4

and that

"But for the frauds culminating in the redemption acquisition, the plaintiff and all the other members of the class would have accepted the Invitation for Tenders and would have tendered their preferred shares."

The initial complaint, which was much less detailed, had invoked not only § 10(b) of the Securities Exchange Act and Rule 10b–5 but also § 14(e).5 Judge McLean dismissed the claim of the original complaint under § 10(b) and Rule 10b–5 on the ground that Levine's purchase prior to May 1965 could not have been induced by Seilon's alleged fraud in the summer and fall of 1968 and there was no allegation that Levine had sold or otherwise disposed of the stock; however, he granted leave to file an amended complaint that would remedy this and any other curable defects. He dismissed the claim under § 14(e), without leave to amend on the ground that while the section renders it unlawful to make an untrue statement of a material fact "in connection with any tender offer or request or invitation for tenders," no offer, request or invitation for tenders was actually made. He later dismissed the amended complaint under § 10(b) and Rule 10b–5 on the independent grounds (1) that, under the authority of SEC v. Sterling Precision Corp., 393 F.2d 214 (2 Cir. 1968), which concerned § 17(a) (2) of the Investment Company Act of 1940, a redemption of preferred stock was not a "purchase" by the company or a "sale" by the stockholder, and (2) that the allegedly fraudulent statement of an inten-

tion to exchange could not "fairly be said to be 'in connection with' the redemption, even if the redemption is considered to be a sale" since Seilon had an absolute right under its charter to redeem.

Accepting *arguendo* the contentions of Levine and the SEC as *amicus* that *Sterling Precision's* refusal to read "purchase" as encompassing a redemption depends upon considerations peculiar to the Investment Company Act, see S. E. C. v. Talley Industries, Inc., 399 F.2d 396, 403 n. 6 (2 Cir. 1968), cert. denied, 393 U.S. 1015, 89 S.Ct. 615, 21 L.Ed. 2d 560 (1969), we would agree that if a company, by making an exchange offer it has no intention to perform, fraudulently induces holders of redeemable preferred stock to give consents necessary to raise the money required for redemption and then avails itself of the funds so acquired for that purpose, the preferred stockholders would have a claim under Rule 10b–5 for any excess of the investment value of their stock over the call price. But this is not such a case, for two reasons.

The first is that the amended complaint not only fails to assert any causal relation between the consent to new credit arrangements given in some way by the preferred stockholders on June 21, 1968—allegedly in response to the fraudulent exchange offer—and the raising of the funds needed for the redemption, but rather shows the contrary. According to the complaint, the redemption funds were derived from the sale of the Copolymer stock and the Plastics Division assets combined with John Hancock's acceptance of the Lockwood stock as collateral in lieu of the cash generated by the Copolymer sale. The complaint,

---

4. No person who purchased preferred shares at the high prices induced by the exchange offer sought to intervene in this action. Seilon's counsel informed us at argument that it had not been sued by any such purchaser.

5. "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."

correctly as we read the restrictions, see fns. 1 and 2, does not allege that any of these transactions required the consent of either class of preferred stockholders or that any such consent was sought or given. It does allege that John Hancock was in part induced to accept the Lockwood stock and release the Copolymer cash by Seilon's representation that it intended to cause Lockwood to make a public offering, and Seilon's charter prohibited the making of any such public offering without the consent of the holders of Prior Preferred. But there is no allegation that those stockholders were ever asked to or did consent to this, and there was no need that they should since Seilon would be free to make the offering once the Prior Preferred was redeemed with the cash John Hancock was to release.

The second, independent reason why a 10b-5 claim is not stated on the theory here under discussion is that the amended complaint does not allege that the preferred shares had an investment value in excess of their call price, apart from the exchange offer which, by hypothesis, Seilon did not intend to perform. While redeemable securities may sometimes have features that cause them to command a premium over the call price, see, e. g., Hanover Bank v. C. I. R., 369 U.S. 672, 673 n. 2, 675 n. 6, 82 S.Ct. 1080, 8 L.Ed. 2d 187 (1962), the amended complaint does not and, in the nature of things, could not allege that the Seilon preferreds, with dividend rates of $4.50 and $5.00 and no convertible or participating features, were securities of that character at the time of the June 1968 misrepresentation. Plaintiff's counsel conceded at the argument that prior to announcement of the exchange offer the preferred stocks were selling below their call prices.[6] Although he contended that the restrictions gave the stocks a value, unascertained in amount, in excess of their call prices, the market apparently did not recognize this, the amended complaint does not allege it, and there would be no basis for such a premium unless it was plain that Seilon could not put itself in a position to redeem without the preferred stockholders' consent. The complaint not only does not assert this but demonstrates the contrary to have been true. No such excess value can be evidenced by Seilon's exchange offer[7] when plaintiff's whole case is that Seilon had no thought of going through with this.

■ Indeed, the entire theory of recovery we have been considering up to this point cannot be deduced from the amended complaint at all. The theory there stated was that plaintiff was entitled to what he could have realized if he had sold his preferred stock at the inflated prices prevailing during the summer of 1968, or, more clearly, to what he could have obtained if Seilon had gone through with the exchange offer and he had sold the common while it still commanded a high price. Even if we should again assume the redemption was a sale by Levine and a purchase by Seilon and also were to hold, in disagreement with the district court, that the misrepresentations were "in connection" therewith, Levine is not entitled to damages on either of such theories.

The complaint does not allege that Levine had any intention of selling his preferred shares during the summer or fall of 1968. Although he might have done so if he had learned of Seilon's allegedly deceitful intent, he could hardly be heard to claim compensation for the premium he might have extracted from some innocent victim if he had known of the fraud and the buyer did not.[8] Even if

---

6. Seilon's counsel advises that the then market price was around $80.

7. The complaint does not state the market price of Seilon common on June 6, 1968, when the proposed exchange offer was first announced. It closed at 15¾ on that day; the then market value of the common proposed to be exchanged thus approximated the call prices.

8. In such a case, Levine would have stood in the posture of a "tippee" whose conduct, as we have indicated elsewhere, would be as reprehensible as that of his insider source. See SEC v. Texas Gulf

he would have sold during the summer had it not been for Seilon's allegedly false representation as to the exchange offer, Levine cannot persuasively claim that his loss in not doing so was caused by Seilon's representation since, according to the complaint, if the representation had not been made, the price of his stock would not have been inflated, and there would have been no gain to be realized by a sale. In fact, the complaint says quite clearly that Levine's intention was to hold the shares and tender them to the company, and he wants the benefit he might thus have realized.[9] The rule of damages applicable under the Securities Exchange Act does not entitle him to recover on any such basis.

Under the "general" laws regime of Swift v. Tyson, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842), the rule in the federal courts was that a defrauded buyer of securities is entitled to recover only the excess of what he paid over the value of what he got, not, as some other courts had held, the difference between the value of what he got and what it was represented he would be getting, Smith v. Bolles, 132 U.S. 125, 10 S.Ct. 39, 33 L.Ed. 279 (1889); Sigafus v. Porter, 179 U.S. 116, 21 S.Ct. 34, 45 L.Ed. 113 (1900). This also is the governing rule under Rule 10b-5 in cases of defrauded buyers. See Estate Counseling Service, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527, 533 (10 Cir. 1962); Janigan v. Taylor, 344 F.2d 781, 786 (1 Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); 2 Bromberg, Securities Laws: Fraud—SEC Rule 10b-5, § 9.1 at 226–27 (1969); 6 Loss, Securities Regulation 3923 (1969). On the other hand a defrauded seller of securities has been allowed to recover under Rule 10b-5 not only the difference

between the actual value and what he received at the time of sale, see Kohler v. Kohler Co., 208 F.Supp. 808, 825–826 (E.D.Wis.1962), aff'd 319 F.2d 634 (7 Cir. 1963) (dictum), but added profits which the buyer has realized through accretions in value subsequent thereto, Janigan v. Taylor, supra, 344 F.2d at 786–787, or which the seller would have realized had he retained the stock for a reasonable period after the disclosure, Myzel v. Fields, 386 F.2d 718, 744–747 (8 Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); see generally Note, Insiders' Liability under Rule 10b-5 for the Illegal Purchase of Actively Traded Securities, 78 Yale L.J. 864, 878–91 (1969). A rationale for this favorable treatment of defrauded sellers has been stated by Chief Judge Aldrich in Janigan to be that "It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them" and that "it is simple equity that a wrongdoer should disgorge his fraudulent enrichment." 344 F.2d at 786. Although plaintiff claims to have been a forced seller, it is difficult to see how the defrauded seller decisions can avail him under the unusual facts of this case. Seilon obtained no "enrichment" and fell heir to no "windfall" by redeeming the preferred shares at their call price; everything indicates the preferred stockholders got all that the stock was worth—indeed, as matters have turned out, a good deal more. It is hardly realistic to accuse a corporation of having secured an unjustified windfall or enrichment as a result of a redemption which was legally and financially within its power to effectuate quite independently of any action by the shareholders whose stock was redeemed. Nor is a corporation unjustly enriched when it withdraws an offer to

Sulphur Co., 401 F.2d 833 (2d Cir. 1968), cert. denied sub nom. Coates and Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

9. The complaint alleges that "during a reasonable period after the announcement

of the redemption," the common attained a market value of $27.50, or $178.75 for 6½ shares. The common stock has now been delisted from the New York Stock Exchange and is currently selling on the Midwest Exchange at somewhat over $2 per share.

exchange common shares for preferred without having obtained valuable property of the preferred shareholders as consideration for the offer. Indeed, it now appears that, far from having been enriched, Seilon would have been much better off if it had redeemed the preferred with common stock rather than parting with more than $3,000,000 in cash. The plain fact is that save for the possibility of selling to an innocent victim, Levine lost nothing from Seilon's alleged fraud except the euphoria he doubtless experienced during the summer and fall of 1968. This does not constitute the "actual damages," see § 28(a), compensable under § 10(b) of the Securities Exchange Act or Rule 10b-5.

Since we hold that the complaint under § 10(b) and Rule 10b-5 was properly dismissed on grounds other than failure to meet the "in connection with the purchase or sale of any security" requirement, which we have assumed *arguendo* to be satisfied, we do not see how Levine's case is advanced by reliance on § 14(e), see fn. 5, where the requirement is "in connection with any tender offer." Although we are not sure we would agree with the district court's rather restrictive reading of this provision, if otherwise applicable, we leave both these issues for another day.

In thus upholding the dismissal of the complaint and the amended complaint, we would not wish to be understood as condoning Seilon's conduct if it was in fact as plaintiff has alleged. There could scarcely be anything more destructive of fair market conditions than for a company to announce an offer to exchange common shares that will inflate the price of senior securities when it has no intention of performing. Here, however, we are not dealing with an application by the SEC for an injunction or an action by a person who suffered actual loss by purchasing preferred shares at the pre-

miums over the call price which the offer produced. We hold only that Levine's suit was properly dismissed because, on his own showing, he suffered no compensable loss.[10]

Affirmed.

10. The district court made no determination whether the action could be maintained as a class action, F.R.Civ.P. 23 (c) (1), beyond ruling that Levine could not represent persons who purchased preferred stock of Seilon after the announcement of the exchange offer, with which we agree. We leave the matter in this status.