JOHN G. KOELTL, District Judge,
dissenting:
The Court today concludes that Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e), which exempts a “settlement payment” from a bankruptcy trustee’s avoidance powers, extends to every transaction in which commercial paper is redeemed by an issuer prior to maturity using the customary mechanism of the Depository Trust Company. Op. at 339.
The issue resolved in this case has never been decided previously by any court of appeals. To capture a premature commercial paper redemption within the definition *340 of “settlement payment” in the Bankruptcy Code, the Court broadly defines “settlement payment” to include a payment that “complete[s] a transaction in securities.” Op. at 336. A “security” is, in turn, broadly defined under the Bankruptcy Code to include various types of debt such as a note, bond, or debenture. 11 U.S.C. § 101(49)(A). The Court’s holding is not required by the opaque definition of “settlement payment” in the Bankruptcy Code, and is inconsistent with the legislative history of that provision. Moreover, the breadth of the Court’s definition threatens routine avoidance proceedings in bankruptcy courts. The Bankruptcy Court correctly concluded in this case that the definition of “settlement payment” should include a requirement that there be a purchase or sale of a security to trigger a “settlement payment.” See In re Enron Creditors Recovery Corp., 407 B.R. 17, 38-40 (Bankr.S.D.N.Y.2009). The redemption of commercial paper indisputably is not the purchase or sale of that commercial paper. Because I disagree with the Court’s conclusion eliminating this requirement, I respectfully dissent.
I.
Section 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b), provides that the trustee of a bankruptcy estate may recover, among other things, money or property transferred by an insolvent debtor in the 90 days preceding bankruptcy, where the transfer (1) was made to or for the benefit of a creditor; (2) was made for or on account of an antecedent debt owed by the debtor; and (3) enabled the creditor to receive more than it otherwise would have under the provisions of the Bankruptcy Code. 11 U.S.C. § 547(b).
Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e), carves out a limited exception to the trustee’s avoidance powers, including its power to avoid preferential transfers under Section 547(b). It provides, in relevant part, that:
Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a ... settlement payment, as defined in section ... 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency....
11 U.S.C. § 546(e). Section 741 in turn defines “settlement payment” in an ambiguous fashion as “a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.” 11 U.S.C. § 741(8).
The question the Court confronts today is whether an issuer’s redemption of commercial paper prior to maturity is a “settlement payment” within the meaning of Sections 546(e) and 741(8). Op. at 333.[1] It answers this question in the affirmative, based on what it terms “the plain language of § 741(8).” Op. at 335; see also Op. at 339. The text of Section 741(8), however, provides virtually no guidance as to the types of transfers that might qualify as settlement payments. The Court understates the severity of this problem by describing the definition as “rather circu *341 lar[ ].” Op. at 334. It is in fact difficult to imagine a more circular, less clear statute than one that defines “settlement payment” by exclusive reference to a variety of types of “settlement payment,” and then concludes with a catch-all that refers back to the undefined “settlement payment,” namely “any other similar payment commonly used in the securities trade.” Thus, while it may be true, as the Court notes, that no provision of the Bankruptcy Code clearly indicates that the redemption of commercial paper is beyond the scope of Section 741(8), see, e.g., Op. at 335, 336, neither does any provision of the Bankruptcy Code clearly indicate that such transactions are within its scope. In other words, the statute is ambiguous.
In light of this statutory ambiguity, other courts of appeals have construed “settlement payment” as a “term ... of art in the securities trade,” which “should be given its established meaning in that industry.” Contemporary Indus. Corp. v. Frost, 564 F.3d 981, 985 (8th Cir.2009) (citing McDermott Int’l, Inc. v. Wilander, 498 U.S. 337, 342-46, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991)). “Specifically, ‘settlement’ refers to ‘the completion of a securities transaction,’ and a ‘settlement payment is generally the transfer of cash or securities made to complete [the] securities transaction.’ ” Id. (quoting Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846, 849 (10th Cir.1990); In re Resorts, Int’l, Inc., 181 F.3d 505, 515 (3d Cir.1999) (alteration in original)); see also In re Comark, 971 F.2d 322, 325 (9th Cir.1992). The parties agree that this is the approach the Court should follow in interpreting “settlement payment,” see Op. at 334, but disagree as to whether an issuer’s redemption of its commercial paper is a “securities transaction.” This question is one of first impression in the courts of appeals.
II.
Enron argues persuasively that a “securities transaction” is a term of art in the securities industry that requires a purchase or sale of securities. This industry understanding is reflected in numerous business dictionaries. See, e.g., Barron’s Financial Guides, Barron’s Dictionary of Finance and Investment Terms 641, 745 (7th ed.2006) (defining “settlement” as the “conclusion of a securities transaction in which a broker/dealer pays for securities bought ... or delivers securities sold and receives payment from the buyer’s broker”); Thomas P. Fitch, Barron’s Dictionary of Banking Terms 423-24 (5th ed.2006) (“[t]he delivery of securities by a selling broker, and payment by a buying broker”); Group of Thirty, Global Clearing and Settlement: A Plan of Action 13 (2003) (“the process by which the ownership interest in securities is transferred from one investor to another, generally in exchange for a corresponding transfer of funds”); New York Stock Exchange, Language of Investing Glossary 30 (1981) (“[conclusion of a securities transaction when a customer pays a broker/dealer for securities purchased or delivers securities sold and receives from the broker the proceeds of a sale”); Bank for International Settlements, Committee on Payment and Settlement Systems & Technical Committee of the International Organization of Securities Commissions, Recommendations for Securities Settlement Systems 48 (2001) (“[t]he completion of a transaction through final transfer of securities and funds between the buyer and the seller”).
The existence of a purchase or sale requirement also finds support in case law. See, e.g., In re Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Savings & Loan Association, 878 F.2d 742, 751 (3d Cir.1989) (“[T]he transfer of record owner *342 ship of securities is an integral element in the securities settlement process.”). Among the definitions of “settlement payment” that the Kaiser Steel Court relied on was the definition from the New York Stock Exchange’s Language of Investing Glossary: The “[c]onclusion of a securities transaction when a customer pays a broker/dealer for securities purchased or delivers securities sold and receives from the broker the proceeds of a sale.” Kaiser Steel, 913 F.2d at 849 (quoting New York Stock Exchange, Language of Investing Glossary 30 (1981)). See also 17 C.F.R. 240.17f-l(a)(5) (“The term securities-related transaction shall mean a purpose [sic], sale or pledge of investment securities, or a custodial arrangement for investment securities.”).
There appears to be no dispute that an issuer’s redemption of its commercial paper does not involve the purchase or sale of a security. Commercial paper is a note evidencing the issuer’s debt. As the Court recognizes, this Court has found that an issuer’s redemption of its bonds and preferred stock is not a “purchase” within the meaning of the Investment Company Act of 1940. SEC v. Sterling Precision Corp., 393 F.2d 214, 217 (2d Cir.1968) (Friendly, J.). While the Court reached that conclusion in the context of the Investment Company Act, the Court’s reasoning was based on, among other factors, the common understanding of an issuer’s repayment of its debt. As Judge Friendly explained, “in common speech a maker’s paying a note prior to maturity in accordance with its terms would not be regarded as a ‘purchase.’ ” Id. at 217. Judge Friendly continued: “[T]he normal discourse of lawyers sets redemptions apart from purchases. The distinction is recognized in corporation statutes, ...; by judicial decision, ...; and by writers on corporation law.” Id. The Court today does not dispute this conclusion, but argues that it is irrelevant because the Court declines to “read a purchase or sale requirement into § 741(8).” Op. at 336.
The Court states that it finds little support for a purchase or sale requirement and explains that cases “make no mention of a requirement that title to the securities changes hands.” Op. at 337. The Court cites Kaiser Steel and its citation to definitions of “settlement” that make no reference to a change in title to securities. However, Kaiser Steel concerned whether a leveraged buyout transaction was included in the definition of a “settlement payment” in § 741(8). There was no question that the transaction involved the purchase of securities. Moreover, as the Court notes, Kaiser Steel specifically cited other source materials that make clear that a change of title is an integral element of the settlement of a securities transaction. See Kaiser Steel, 913 F.2d at 849 (citing New York Stock Exchange, Language of Investing Glossary 30 (1981)(quoted above); D. Scott, Wall Street Words 320 (1988) (defining “settlement” as the “[tjransfer of the security (for the seller) or cash (for the buyer) in order to complete a security transaction”)). Kaiser Steel cannot stand for the proposition that no purchase or sale is required for a securities transaction when the transaction at issue did include a purchase and when the Court cited to source materials that identified a purchase as an essential element of a settlement payment.
The Court today points to no case that holds that there is no purchase or sale requirement for a securities transaction, and provides no source that indicates that there is a common industry understanding that the redemption of commercial paper is the completion of a securities transaction.[2]
*343 III.
A.
The relevant legislative history supports the conclusion that redemptions of commercial paper are not protected by Section 546(e)’s safe harbor. In 1975, Congress amended the Securities Exchange Act of 1934 (“the 1934 Act” or “the Act”), 48 Stat. 881, codified at 15 U.S.C. § 78a et seq., to create a national system for the clearance and settlement of securities transactions. Bradford Nat’l Clearing Corp. v. SEC, 590 F.2d 1085, 1091-92 (D.C.Cir.1978). The predecessor of Section 546(e) was first enacted in 1978, and applied only to commodities markets. See Kaiser Steel, 913 F.2d at 848-49; H.R.Rep. No. 97-420, at 1-3 (1982). This left open the possibility that the avoidance provisions of Section 547(b) could be applied to the settlement of securities transactions, and the failure to include securities transactions in the settlement safe harbor lent force to the argument that the clearing agencies were not entitled to protection from preference avoidance when they cleared securities transactions. This anomaly inadvertently jeopardized the national settlement system. See Bankruptcy of Commodity and Securities Brokers: Hearings Before the Subcomm. on Monopolies and Commercial Law of the H. Comm, on the Judiciary, 97th Cong. 238-67 (1981) (statement of Bevis Longstreth, Comm’r, SEC). Clearing agencies were exposed to risk because they were “the critical link between the buyer’s broker and the seller’s broker”; they “simultaneously guaranteed” the delivery of securities to the buyer and the delivery of the purchase price to the seller. Id. at 245.[3] In response to this concern, in 1982, Congress adopted substantially the current version of Section 546(e), which more broadly covered settlement payments. H.R.Rep. No. 97-420, at 2 (1982).[4]
These concerns were not implicated by the market for commercial paper at the time of Section 546(e)’s enactment, and cannot justify the application of the safe *344 harbor to redemptions of commercial paper today. As an initial matter, the 1934 Act did not, and does not, apply to commercial paper, which is not a “security” for purposes of the Act. See 15 U.S.C. § 78c(a)(10).[5]
Moreover, Congress’s concern for the stability of central counterparties that guarantee both sides of a securities transaction would not justify sweeping redemp-tions of commercial paper within Section 546(e)’s safe harbor, because transactions in commercial paper are not cleared through such a central counterparty. As the Court notes, “the DTC acted as a conduit rather than a clearing agency that takes title to the securities during the course of the transaction.” Op. at 334. Unlike the National Securities Clearing Corporation (“NSCC”), which clears transactions in equity and debt securities covered by the 1934 Act, the DTC does not act as an intermediary for trades by undertaking independent obligations to deliver securities to the buyer and payment to the seller. See Pet Quarters, Inc. v. Depository Trust and Clearing Corp., 559 F.3d 772, 776-77 (8th Cir.2009). Rather than act as such a central counterparty, the DTC serves as an electronic bookkeeper that processes payments; it does not guarantee the performance (and assume the risk of non-performance) of any other party. See id. (explaining that the DTC “tracks transfers of indirect security entitlement positions among its members, eliminating the need to transfer the physical stock certificates,” while “NSCC acts as the intermediary between buyer and seller ... and assumes the rights and obligations of buyers and sellers to receive, pay for, and deliver securities”). Because the DTC does not guarantee the obligations of its members, and does not take title to the securities or funds it clears, it is not exposed to any risk on account of a transaction that is challenged by a bankruptcy trustee.
The Court acknowledges this distinction between the DTC and the NSCC, but rejects it as immaterial on the theory that “the absence of a financial intermediary that takes title to the transacted securities during the course of the transaction is [not] a proper basis on which to deny safe-harbor protection.” Op. at 338. In support of this conclusion, it relies on cases from other courts of appeals that have applied Section 546(e)’s safe harbor to leveraged buyouts of companies that “involved financial intermediaries who served only as conduits.” Op. at 338 (citing In re Plassein Int’l Corp., 590 F.3d 252, 257-59 (3d Cir.2009); In re QSI Holdings, Inc., 571 F.3d 545, 549-50 (6th Cir.2009); Frost, 564 F.3d at 986). Accepting the reasoning of the courts of appeals in those cases, however, does not militate in favor of extending Section 546(e)’s safe harbor to transactions in commercial paper. Those cases stand for the proposition that, if Section 546(e) applies to a particular type of transaction — namely, purchases of equity securities — an individual transaction does not lose safe-harbor protection simply because it does not involve a central coun-terparty, and thus does not directly implicate the concerns that led Congress to enact the section.[6] The leveraged buyout cases do not resolve the question the Court *345 must answer in the first instance: whether a different type of transaction — a redemption of commercial paper — is covered by Section 546(e).[7]
B.
The conclusion that redemptions of commercial paper are not covered by Section 546(e) is further supported by subsequent legislative history.[8] Section 547(c)(2) of the Bankruptcy Code provides that a trustee may not avoid under Section 547 a transfer
to the extent that such transfer was in payment of a debt incurred by the debt- or in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms.
11 U.S.C. § 547(c)(2). As originally enacted in 1978, the “ordinary course” defense was restricted to preference actions involving short-term debts of a duration of 45 days or less. See Fidelity Sav. & Inv. Co. v. New Hope Baptist, 880 F.2d 1172, 1175— 76 (10th Cir.1989). In 1984, two years after the passage of Section 546(e), the “ordinary course” defense was amended to eliminate this restriction. A discussion between Senators Dole and DeConcini, as part of the debate surrounding passage of the amendment, makes clear that Congress was primarily concerned with ensuring that “ordinary course” redemptions of commercial paper with longer maturities would come within Section 547(c)(2)’s safe harbor. Id. If, as the Court concludes, Section 546(e) protects every redemption of commercial paper, “without regard to ... the motives and circumstances of the redemption,” Op. at 333, then this amendment was unnecessary because any redemption of commercial paper — whether made in the ordinary course of business or not — would be protected by the “settlement payment” exclusion that Congress had adopted two years before.
IV.
Enron’s reading of Section 546(e) finds further support in the policies reflected in the Bankruptcy Code. In Union Bank v. Wolas, 502 U.S. 151, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991), the Supreme Court discussed the congressional priorities that motivated enactment of Section 547, and concluded that preference actions under that section are “intended to serve two basic policies”:
A preference is a transfer that enables a creditor to receive payment of a greater *346 percentage of his claim against the debt- or than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankruptcy estate. The purpose of the preference section is twofold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debt- or. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter “the race of diligence” of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section— that of equality of distribution.
502 U.S. at 160-161, 112 S.Ct. 527 (citing H.R.Rep. No. 95-595 177-178 (1977)).
These goals — preventing a “race to the courthouse” and ensuring equality of distribution among creditors — are severely undermined by the interpretation of Section 546(e) adopted by the Court. What Enron alleges happened in this case, according to the Court’s interpretation of its papers, is instructive: “it made the redemption payment under pressure from noteholders seeking to recover on their investments amidst rumors of Enron’s imminent implosion.” Op. at 331. That is, under intense pressure from certain creditors, Enron extinguished its debt by paying to them funds in excess of what they would have received on the open market and, more importantly, far in excess of what they would have received pursuant to the provisions of the Bankruptcy Code. See 11 U.S.C. § 547(b). The scenario depicted by the appellees is no less troubling. They assert, according to the Court, that “Enron redeemed its commercial paper to ‘calm the irrational markets’ and leave a favorable impression that would allow it to reenter the commercial paper market once ‘bad publicity’ about the company’s stability ‘had blown over.’ ” Op. at 331-32. Those voluntary debt payments are no different from other efforts of a debtor shortly before bankruptcy to prefer some creditors over others. Such transfers, which result in creditors of equal priority being treated unequally, and which decrease the liquidity of a corporation attempting to avoid a slide into bankruptcy, are at the very core of the trustee’s avoidance powers under Section 547.
The Court’s holding that a settlement payment requires only the transfer of cash to complete a securities transaction, without any purchase or sale of a security, is indeed extraordinarily broad. In fact, the Court’s definition of a settlement payment would seem to bring virtually every transaction involving a debt instrument within the safe harbor of Section 546(e), thus allowing the settlement payment exception to swallow up the Section 547(b) avoidance provision.
The Court concludes that its holding poses no threat to the viability of the Bankruptcy Code’s preference provisions on the ground that this case involves “widely issued debt securities,” and not “non-tradeable bank loans.” Op. at 337. The Court, however, offers no basis for distinguishing between the two types of debts, and under 11 U.S.C. § 101(49)(A), there is none; notes, bonds, and debentures are “securities” under the Bankrupt *347 cy Code irrespective of whether they are widely issued or tradeable. The Court’s reasoning thus applies equally to any payment on account of a debt evidenced by a writing, and does indeed imperil decades of cases that allow the avoidance of debt-related payments. See, e.g., Wolas, 502 U.S. at 162, 112 S.Ct. 527 (remanding to determine whether payments of long-term debt were within the ordinary course of business exception to avoidance under Section 547(c)(2)).
The Court does not dispute that the payment of any ordinary loan evidenced by a note would fall within its definition of a settlement payment, but the Court finds that “the context of the securities industry will exclude from the safe harbor payments made on ordinary loans.” Opinion at 337. The Court cites no authority for this proposition, and the terms of its definition would cover such payments.
The Court’s holding is wholly unnecessary. The issue presented in this case is a narrow one — whether the premature redemption of commercial paper by the issuer falls within the safe harbor of a “settlement payment” under section 546(e). The issue is an unusual one, as reflected by the fact that it has never arisen in any prior decision of any court of appeals. However, by eliminating the “purchase or sale” requirement that would exclude such payments, the Court undermines the ability of bankruptcy trustees to avoid preferential payments on account of ordinary debts. The Court argues that including a “purchase or sale” requirement would not “necessarily exclude all payments made on ordinary loans.” Opinion at 337. It is not clear why this is an argument against a “purchase or sale requirement,” which should be required by the common industry understanding and legislative history of section 546(e). The Court does not dispute that recognizing such a requirement in fact excludes the premature redemption of commercial paper from the scope of the “settlement payment” safe harbor of section 546(e), and does so without imperiling the regular avoidance powers of bankruptcy trustees for ordinary loans. The Court appears to object that the “purchase or sale” requirement would not exclude various ways in which an issuer might deal with its commercial paper. The Court hypothesizes that companies could protect their premature redemptions of commercial paper by turning them into repurchases rather than redemptions, if there is a “purchase or sale” requirement. Opinion at 337. But, under the Court’s approach, such repurchases would still be covered by the “settlement payment” safe harbor, and, in addition, the Court’s approach imperils the ordinary repayment of loans. The fact that the “purchase or sale” requirement would not address all of the ways in which a company might deal with its commercial paper is not a reason to find that premature redemptions of commercial paper do not fall within the “settlement payment” safe harbor.
CONCLUSION
For the reasons explained above, I respectfully dissent.

. As the Bankruptcy Court noted, commercial paper is a note evidencing a debt, “with a corporation borrowing the money in the marketplace instead of from a bank.” Enron, 407 B.R. at 37, 38. Commercial paper with a maturity at the time of issuance of nine months or less is excluded from the definition of a "security” under the Securities Exchange Act of 1934. See 15 U.S.C. § 78c(a)(10).

. The Court downplays Enron's argument that applying the safe harbor to the redemption of commercial paper would undermine uniform case law that allows the avoidance of debt-related payments. Op. at 337. But this is not an argument that a purchase or sale requirement is not part of a "securities transaction.” Rather, it is an effort to downplay the significance of the Court's holding. As explained in Part IV, the Court’s distinction is unpersuasive, and the decision will in fact undo decades of well-established law. It is sufficient at this point to note that the Court’s attempt to distinguish prior case law is not an argument why the Court’s definition of a securities transaction is in fact correct.

. The Court’s reading of the legislative purpose behind Section 546(e) at times appears substantially broader. It writes: “If a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at risk.” Op. at 334 (emphasis added). However, this concern could likewise be invoked for refusing to apply the Bankruptcy Code’s preference provisions in any context; there is always a risk that the transferee of an avoided transfer will be negatively affected and destabilized by the trustee’s exercise of its avoidance powers. The legislative history indicates that Congress intended to eliminate only a particular subset of claims: those that might jeopardize the stability of clearing agencies.

.In 2006, Congress adopted amendments to Section 546(e) that were “technical changes" designed to "update the language to reflect current market and regulatory practices” and to "clarify [] the treatment of certain financial products.” H.R. Rep. 109-648, at 2 (2006). The amendments do not shed any light on whether the premature redemption of commercial paper is covered by the exclusion for a "settlement payment.”

. The 1934 Act exempts from the definition of security "any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.” 15 U.S.C. § 78c(a)(10).

. As the Court points out, the issue on this appeal concerns only an issuer's premature redemption of commercial paper. Opinion at 337-38 n. 2.

. The Court questions any reliance on the fact that Congress enacted the safe harbor out of concern for the stability of central counter-parties when various courts of appeals have rejected a restriction on the safe harbor in leveraged buyout transactions that do not involve such counterparties. Op. at 338-39 n. 3. That is not a basis to ignore the legislative history, which reveals that Congress was primarily concerned with upsetting the securities settlement process. That settlement process involves the purchase and sale of securities that are ordinarily cleared through a clearing agency. The fact that some transactions that do not involve a clearing agency — leveraged buyouts — are protected by the safe harbor because they were not carved out by Congress is not a basis for disregarding the legislative history and its focus on transactions involving the purchase and sale of securities. The Court points to nothing in the legislative history of the ambiguous “settlement payment” provision that indicates that it was intended to cover the redemption of commercial paper.

. Subsequent legislative history is not entitled to the same weight as contemporaneous legislative history, but it may provide “some guidance” as to the legislative intent for a prior congressional act. See Davis v. United Air Lines, Inc., 662 F.2d 120, 123-24 (2d Cir. 1981).