**In re ENRON CREDITORS RECOVERY CORP., et al., Reorganized Debtors.**

**ALFA, S.A.B. de C.V., Appellant Defendant,**

**v.**

**Enron Creditors Recovery Corp., Appellee Plaintiff.**

**ING VP Balanced Portfolio, Inc. and ING VP Bond Portfolio, Inc., Appellant Defendants,**

**v.**

**Enron Creditors Recovery Corp., Appellee Plaintiff.**

Bankruptcy No. 01–16034 (AJG).

Adversary Nos. 03–92677(AJG), 03–92682(AJG).

Nos. 09 civ. 9030(cm), 09 civ. 9031(cm).

United States District Court, S.D. New York.

Nov. 20, 2009.

McMAHON, District Judge.

## INTRODUCTION

Before the Court is the appeal of the defendants in two adversary proceedings from an order of the Bankruptcy Court (Gonzalez, J.) denying their motions for summary judgment. *See Enron Creditors Recovery Corp. v. J.P. Morgan Sec., Inc. (In re Enron Creditors Recovery Corp.),* 407 B.R. 17 (Bankr.S.D.N.Y.2009). This Court granted the motion of the defendants (Alfa and ING) for permission to appeal on a limited question. *See Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.),* Nos. M–47 & M–47(a), 2009 WL 3349471 (S.D.N.Y. Oct. 16, 2009).

The instant appeal is limited to a single question—whether the § 546(e) "safe harbor," which bars avoidance of transfers that constitute "settlement payments" made in connection with transactions in securities, extends to transactions in which commercial paper is redeemed by the issuer prior to maturity, using the customary mechanism of the Depository Trust Company (the "DTC") for trading in commercial paper (the "Redemption"), without regard to extrinsic facts about the nature of the Redemption, the motive behind the Redemption, or the circumstances under which the payments were made. Defen-

dants, supported by the Securities and Exchange Commission (the "SEC"), take the position that the prepayment (redemption) of debt evidenced by commercial paper (which no one seriously disputes is a "security" as that term is used in the Bankruptcy Code), using the mechanism of the DTC, is a "transaction in securities." They further argue that every payment made to close out such a transaction qualifies as a "settlement payment" as long as it is effected by a broker or financial institution, without regard to whether the underlying transaction was out of the ordinary from a commercial point of view. Enron takes the opposite position: that the prepayment of debt is not a "transaction in securities" because there was no "purchase or sale" of securities. For that reason, Enron argues, the payment used to effect the redemption and retirement of the debt securities does not qualify as a "settlement payment," no matter the role of the DTC or any broker or financial institution.

Judge Gonzalez accepted Enron's argument.

For the reasons explained below, the decision of the bankruptcy court is reversed.

## BACKGROUND

### Relevant Statutory Language

Section 546 of the Bankruptcy Code (Title 11 of the United States Code), entitled "Limitation on avoiding powers," sets out the limitations on a trustee's or debtor-in-possession's right to avoid certain pre-petition transfers, including those made within ninety days of the filing of a petition (preferences), or one year if the transfer was made to an insider. *See* 11 U.S.C. § 546(e); 547(b)(4) (trustee's avoidance powers). Section 546(e) of the Bankruptcy Code provides a "safe harbor" by exempt-

ing from that avoidance certain types of payments that are commonly employed in connection with transactions in securities markets. In relevant part, the "safe harbor" provides that a trustee or debtor-in-possession may not avoid a

settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency.

11 U.S.C. § 546(e).

Section 741(8) of the Bankruptcy Code, to which Section 546(e) specifically refers, defines the term "settlement payment" tautologically, as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." *Id.* § 741(8).

### Abbreviated Statement of Facts

In view of the limitation imposed by the Court on this appeal, the following facts (all of which are taken from Judge Gonzalez's opinion; none of which represents an independent finding by this Court) should be kept in mind.

Enron Corporation and its affiliates ("Enron") filed petitions under Chapter 11 of the United States Code on December 2, 2001. *Enron Creditors Recovery Corp. v. J.P. Morgan Sec., Inc.*, 407 B.R. 17, 21 (Bankr.S.D.N.Y.2009), Between October 26, 2001, and November 6, 2001, and thus within ninety days of that filing, Enron paid out more than $1.1 billion to retire certain of its unsecured and uncertificated commercial paper (or notes) prior to its stated maturity date (hereinafter "the Redemption")—in some cases, only days prior to maturity. *Id.* The paper was redeemed at the accrued par value, calculated as the

price originally paid plus accrued interest; this was well in excess of the then—market price of the notes. *Id.* at 22 n. 4. Further, the paper was redeemed prior to maturity, even though the Offering Memorandum for the commercial paper gave Enron no legal right to compel the holders to surrender their notes and explicitly provided that the notes were "not redeemable or subject to voluntary prepayment by [Enron] prior to maturity." *Id.* at 22.

Three broker-dealers, JP Morgan, Goldman Sachs ("Goldman") and Lehman Brothers Commercial Paper, Inc. ("Lehman"), participated in some fashion in the Redemption. *See id.* & n. 3. Whether they were or were not acting as agents for Enron has been identified by Judge Gonzalez as a disputed issue of fact, *see id.* at 26–28, but it appears undisputed that the noteholders (including Alfa and ING, whose immediate contraparty was JP Morgan) transferred the commercial paper they hold directly to the broker-dealers, who paid them the redemption price. *Id.* at 24–25. It is also undisputed that these intermediary firms then transferred the paper to Enron's "issuing and paying agent" for commercial paper, Chase IPA. *See generally id.* at 22–26. Enron argues that it never technically acquired title to the commercial paper, because Chase IPA did not in turn transfer the commercial paper to Enron, but instead withdrew (or extinguished) it from the DTC system as soon as all the transactions had been concluded. *Id.* at 27, 38. However, Chase IPA's very title—"issuing and paying agent"—indicates that it was acting on Enron's behalf when it accepted the transfer of the notes. Judge Gonzalez has not suggested that there is any issue of fact concerning the agency status of Chase IPA.

Although the premature Redemptions were out-of-the-ordinary transactions, they were concluded through the usual medium for concluding transactions in commercial paper, by using the DTC, an entity created "to reduce costs and provide clearing and settlement efficiencies by immobilizing securities and making 'book-entry' changes to ownership of securities." *Id.* at 22 n. 2. Specifically, on October 29, 2001, the commercial paper held by Alfa and ING was transferred to JP Morgan via the DTC; that is, the paper was debited from the transferor's DTC accounts and credited to JP Morgan's account, while the payments made by JP Morgan were credited to the former holders' accounts and debited from JP Morgan's account. *Id.* at 26, Later that same day, JP Morgan transferred the commercial paper it had received from Alfa and ING to the DTC account of Enron's issuing and paying agent, and a corresponding payment was made by Enron to JP Morgan's account at DTC. *Id.* The commercial paper was extinguished immediately thereafter pursuant to DTC rules governing early retirement of commercial paper. *Id.; see also id.* at 40 (DTC procedures).

Confirmations of these transactions issued in the ordinary course. These confirmations referred to the transactions as securities trades, called them "purchases" from the holders, and referenced a "trade date" and "settlement date." (*See, e.g.,* App. of Appellants, Oct. 27, 2009 ("Appellants' App."), at A179–187.)

**The Proceedings Below**

*Enron I*

In 2003, Enron brought nearly 200 adversary proceedings against the former noteholders, seeking to avoid and recover, as preferential or fraudulent transfers, the payments made for the purpose of prepaying individual notes prior to their maturity dates. The noteholders moved to dismiss Enron's adversary complaints, arguing principally that the transfers were subject

to the Section 546(e) safe harbor and therefore could not be avoided. In response, Enron had argued that:

(1) its prepayments were not "settlement payments" because a payment to retire debt does not complete a "securities transaction";

(2) the safe harbor applies only to settlement payments that are "commonly used in the securities trade," and these prepayments were extraordinary, not common;

(3) when commercial paper is retired, it is not a security per the Securities Exchange Act of 1934;

(4) section 546(e) applies only to securities transactions that could undermine the clearance and settlement system if unwound, and no such risk of a "ripple effect" exists here.

(Br. of Appellee Enron Creditors Recovery Corp., Oct. 29, 2009 ("Appellee's Br."), at 4.)

The Bankruptcy Court (Gonzalez, J.) denied the motions to dismiss. *See Enron Corp. v. J.P. Morgan Sec., Inc. (In re Enron Corp.)*, 325 B.R. 671, 686 (Bankr. S.D.N.Y.2005) (*"Enron I"*). Judge Gonzalez did not reach all of the issues raised by Enron. He did, however, make two critical rulings.

First, Judge Gonzalez held that:

because the § 546(e) safe harbor only protects from avoidance those settlement payments that are "commonly used in the securities trade" and because, on a motion to dismiss, the Court must accept Enron's allegations as true, evidence must be presented as to whether payments made with respect to short-term commercial paper prior to the maturity date, at significantly above market prices and contrary to the offering documents in the midst of coercion by the holders of the commercial paper result-ing from public announcements that make clear that the company is in a severe financial crisis constitute settlement payments commonly used in the securities trade.

*Enron I*, 325 B.R. at 685–686. Put otherwise, the learned bankruptcy judge ruled that the uncommon nature of the transaction might impact whether the payments qualified as "settlement payments."

Second, Judge Gonzalez held that:

evidence is also necessary as to whether the Transfers [early redemptions] were made to retire and extinguish the debt or to trade the securities. If the payments were made to retire the debt, the Court would need to address the issue of whether such payments—which were not then for the purchase, sale or loan of securities but were to satisfy the underlying debt obligation—are nonetheless settlement payments for the purposes of § 546(e).

*Id.* at 686. Judge Gonzalez thus signaled the possibility that a settlement payment might be limited to particular types of securities transactions, of which redemption was not one.

*Enron II*

Following Judge Gonzalez's decision in *Enron I*, most creditors filed motions for leave to file an interlocutory appeal. These motions were denied in 2007 by my colleague, Judge Daniels.

After discovery, those creditors who had not already settled with Enron moved for summary judgment, renewing the arguments they had made on the motion to dismiss. On June 29, 2009, the bankruptcy court denied those motions. *See Enron Creditors Recovery Corp. v. J.P. Morgan Secs., Inc. (In re Enron Creditors Recovery Corp.)*, 407 B.R. 17 (Bankr.S.D.N.Y. 2009) (*"Enron II"*). Enron describes the bankruptcy court's decision as having "re-

affirmed [the court's] prior ruling that the 'commonly used' clause modified the definition of settlement payment in § 741(8)," even though the court "did not rely on this issue and instead ruled that Enron merely repaid and retired the commercial paper debt, which did not constitute a settlement payment, as no securities transaction had occurred." (Appellee's Br. at 5 (citing *Enron II*, 407 B.R., at 30–31, 37–41).) Enron's description of Judge Gonzalez's holding is somewhat inaccurate.

First, in denying summary judgment, Judge Gonzalez repeatedly emphasized the unusual nature of Enron's redemptions throughout his analysis of the applicability of the 546(e) safe harbor. *See Enron II*, 407 B.R. at 37–41. Specifically, Judge Gonzalez opined that whatever rules might apply to the redemption of commercial paper at maturity, "the transactions at issue [ ] were not conducted in the *usual* manner." *Id.* at 37 (emphasis added). Indeed, he highlighted the fact that "in an orderly exit from the commercial paper market, the issuer *usually* draws down on its bank lines of credit to pay the commercial paper as it matures, not to prepay the commercial paper." *Id.* at 38 (emphasis added). He also noted that "the record reflects that it was the insistence by the broker/dealers to depart from their *usual* role of principal in a commercial paper transaction that altered '*business as usual*' in the secondary market"; that "the broker/dealers were primary players in taking the transactions at issue outside the realm of what was *common in the trade*, by their efforts to depart from their *usual* role as principal"; and that "the insistence by each of the broker/dealers to act as agent, instead of their *usual* role of principal, further supports the proposition throughout the industry that no one readily considered the safe harbor as protecting the types of transactions at issue here." *Id.* at 41 (emphasis added). Thus, the fact that the early redemptions were unusual was—at a minimum—important to the bankruptcy court's reasoning.

Second, while Judge Gonzalez did indeed conclude that "repayment and retirement" of "commercial paper debt" was not a "settlement payment" because "no securities transaction had occurred," (Appellee's Br. at 5 (citation omitted)), he actually went further, holding that only a securities transaction involving a "transfer of ownership" could be followed by a settlement payment that qualified for the section 546(e) safe harbor. *Enron II*, 407 B.R. at 39 (internal quotation marks omitted). Judge Gonzalez concluded that "the transfer of 'ownership' of a security is an integral element in the securities settlement process." *Id.* He found that, in redeeming its notes, Enron never "acquire[d] title or ownership of the commercial paper"—a conclusion that, based on the papers submitted to this court, appears to be hotly disputed as a matter of fact. *Id.* (discussing ownership of the notes). Combined with the fact that the "payments made to the [creditors] were not based upon the prevailing market rate of the commercial paper," Judge Gonzalez concluded that the redemptions were not "settlement payments" within the ambit of section 546(e)'s safe harbor. *Id.* He then set the matter for trial on the issue of whether JP Morgan had been acting as Enron's agent during the Redemptions.

This Court agreed to hear an appeal from Judge Gonzalez's decision on an interlocutory basis.

## DISCUSSION

### I. Legislative History of the Safe Harbor

Section 546 was first enacted in 1978 in response to a decision from a court in this District holding that the Bankruptcy Code

did not prohibit a trustee from recovering a margin payment made to a commodities clearinghouse. *See* S. Rep. 95–989, at 106 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5892 (citing *Seligson v. New York Produce Exchange,* 394 F.Supp. 125 (S.D.N.Y.1975)). Then-codified as section 764(c), the safe harbor applied exclusively to margin payments *from* commodities clearing organizations and thus only protected transfers in "the ordinary course of business in the market." H.R. Rep. 95–595, at 392 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6348.

In 1982, Congress revisited the safe harbor in order "to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities markets." H.R. Rep. 97–420, at 2 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 583, 583. To this end, section 764(c) was replaced by three provisions, codified at sections 546(e), 741(5) and 741(8). Section 546(e) broadened the former safe harbor by extending its scope to include the securities markets. It also expanded the safe harbor's protection "beyond the ordinary course of business to include margin and settlement payments to and from brokers, clearing organizations, and financial institutions." *Kaiser Steel Corp. v. Charles Schwab & Co.,* 913 F.2d 846, 849 (10th Cir.1990) (footnote omitted); *see also* 11 U.S.C. § 741(5) (margin payments); *id.* § 741(8) (settlement payments).

Thus, unlike its predecessor, section 546(e) encompassed both "margin payments" *and* "settlement payments" (defined by section 741(8)). And whereas section 746(c) had only protected payments *from* clearing organizations, section 546(e) included payments *from* brokers, clearing organizations and financial institutions, as well as payments *to* or even *on behalf of* such entities. *See* 11 U.S.C. § 546(e). As one court in this District has noted, "The intent to reach broadly to encompass all aspects of securities industry practices is manifested in the language of the statute." *Jackson v. Mishkin,* 263 B.R. 406, 477 (S.D.N.Y.2001).

This broad protection was designed to ensure settlement finality, and therefore market stability. Congress opined that the safe harbor would prevent "the insolvency of one commodity or security firm from spreading to other firms," which could otherwise "threaten the collapse of the affected industry." H.R. Rep. 97–420, at 2 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 583, 583. In other words, the overriding purpose of the 1982 safe harbor amendments was "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *Id.*

## II. Section 741(8) Does Not Limit "Settlement Payments" to the Ordinary Course

 It cannot be doubted that the definition of "settlement payment" in section 741(8) of the Code is unhelpfully circular: the term is defined with reference to itself, as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on the account, a final settlement payment, or any other similar payment commonly used in the securities trade." *See, e.g., Kaiser Steel Corp. v. Charles Schwab & Co.,* 913 F.2d 846, 848 (10th Cir.1990). However, five circuit courts of appeal (albeit not the Second Circuit) have addressed the meaning of the term in the context of Section 546(e)'s "safe harbor," and all have agreed that a "settlement payments" is not limited to a payment that is "commonly used in the securities trade." Conventions of statutory interpretation, including the rule of

the last antecedent, convince me that the holdings of the sister circuits are correct. Accordingly, this Court respectfully disagrees with the bankruptcy court and holds that section 741(8) does not limit the definition of "settlement payment" to payments *commonly used* in the securities trade." *See* 11 U.S.C. § 741(8) (emphasis added).

## A. Judicial Interpretations of Section 741(8)

Twenty years ago, the Third Circuit paved the way for a broad application of the term "settlement payment" with its decision in *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Assoc.,* 878 F.2d 742 (3d Cir.1989). In that case, Judge Aldisert refused to limit the 546(e) safe harbor to "settlement payments" that were made in connection with "*orthodox* corporate securities transactions." *Id.* at 750 (emphasis added). In *Bevill,* the transaction at issue was a transfer of securities pursuant to a repurchase agreement, which has a completely different settlement process from ordinary course trades that are concluded over a stock exchange. Then, as now, the latter type of trade had to be "settled" within five days of the trade. *Id.; see also* Thomas P. Fitch, *Barron's Dictionary of Banking Terms* 424 (5th ed.2006) (defining "settlement date" and describing "regular way settlement"). Because the securities at issue in *Bevill* were delivered outside the five-day window, the district court concluded that the consideration paid for the repurchase of the securities did not qualify as a "settlement payment," and so was not saved from avoidance by the Section 546(e) safe harbor. *Id.* The Third Circuit disagreed. "Such an interpretation," the court explained, "is consistent with two basic intentions of Congress: that a 'settlement payment' may be the deposit of cash by the purchaser or the deposit or transfer of

the securities by the dealer, and that it includes transfers which are normally regarded as part of the settlement process" regardless of when they occur. *Id.* at 752.

Ten years later, the Third Circuit rejected a second attempt to restrict the meaning of "settlement payment." That case. *Lowenschuss v. Resorts Int'l, Inc.,* 181 F.3d 505 (3d Cir.1999), involved a securities transfer within the context of a leveraged buyout ("LBO"). Although the court noted that "a payment for shares during an LBO is obviously a common securities transaction," the court underscored the unusual mechanics of the payments. *Id.* at 516. Specifically, the court explained that the payments were unconventional in that they were transferred directly to shareholders without the use of any intermediary financial institution. *Id.* Nevertheless, the court held, "Despite the fact that payments to shareholders in an LBO are not the most common securities transaction," there was "no absurd result from the application of the statute's plain language" to shield such payments from avoidance under section 546(e). *Id.*

In pronouncing its holding in *Lowenschuss,* the Third Circuit endorsed similarly broad interpretations of Section 546(e) that had been reached by the Ninth and Tenth Circuits in the years following *Bevill,. See id.* at 515 (*citing Jonas v. Resolution Trust Corp. (In re Comark),* 971 F.2d 322 (9th Cir.1992) ("*Comark*"); *Kaiser II,* 952 F.2d 1230 (10th Cir.1991); *Kaiser I,* 913 F.2d 846). All three appellate courts rejected the argument that a payment could not qualify as a "settlement payment" if it was not made as part of a so-called "ordinary course" securities transaction.

The Tenth Circuit was first to follow in the footsteps of *Bevill,* in a pair of cases involving Kaiser Steel decided in 1990 and

1991. In *Kaiser I,* a bankruptcy trustee brought fraudulent transfer claims against broker Charles Schwab & Co., Inc. ("Charles Schwab" or "Schwab"), which had tendered its clients' shares of Kaiser common stock into an LBO and received payment in return. 913 F.2d at 847. Most of the shares were held by the DTC, which tendered them on Schwab's behalf to the issuer's disbursing bank and received cash and preferred stock in the surviving entity in return. *Id.* at 847–48. The DTC (through National Securities Clearing Corporation, Schwab's DTC sponsor) then transferred the cash to the broker, which credited the payments to its customers' accounts. *Id.*

The Tenth Circuit affirmed summary judgment for the broker, who had invoked the Section 546(e) safe harbor and argued that the payments were shielded from avoidance. Holding that payments made in consideration for the tender of the securities were "settlement payments," and so could not be avoided by the debtor-in-possession, the Court of Appeals noted that the definition of "settlement payment" in section 741(8) "is 'extremely broad' . . . in that *it clearly includes anything which may be considered a settlement payment."* *Id.* at 848 (emphasis added, citations omitted). While not unsympathetic to Kaiser's argument that "settlement payments" were payments made to settle (conclude) "routine securities transactions," the Tenth Circuit concluded that adopting the argument would be nothing short of "an act of judicial legislation . . . . [because] what occurred in this case was 'the delivery and receipt of funds and securities,' " and "the transfer of money and preferred stock was the settlement of that transaction." *Id.* at 850 (citation and footnote omitted). The statute on its face required nothing more.

One year later, in *Kaiser II,* the Tenth Circuit expounded further on its holding in *Kaiser I,* At issue in *Kaiser II* were fraudulent transfer claims asserted directly against the selling shareholders. 952 F.2d at 1235. Most of these shareholders received value through the DTC. *Id.* Payments passed from the debtor's disbursing bank to the DTC, which transferred these payments to the accounts of its participants, including brokers and other financial intermediaries. *Id.* at 1235–36. The intermediaries disbursed the payments to their customers (who were the beneficial owners of the Kaiser stock) and retained the payments for shares that they owned for their own accounts. *Id.* at 1236. Since the DTC stopped handling trades of Kaiser Steel shares prior to the effective date of the LBO, some financial intermediaries and beneficial owners tendered their shares directly to Bank of America and were paid directly by the bank. *Id.* at 1236.

The debtor in *Kaiser II,* still trying to avoid the LBO-related payments, argued once again that the payments received by the equity shareholders were not "settlement payments" because they were not made in connection with "routine" purchases and sales of securities. Alternatively, the debtor argued that Section 546(e) protected payments only to the extent the recipient was a participant in the clearance and settlement system, and so did not extend to payments—even settlement payments—made to non-financial intermediaries who owned stock.

The Tenth Circuit rejected both arguments. It noted that "neither § 546(e) nor § 741(8) is on its face limited to 'securities contracts,' as defined by the Bankruptcy Code, or to 'trades,' as defined by *Kaiser."* *Id.* (citation omitted). The court contrasted the safe harbor with 11 U.S.C. § 362(b)(6), which explicitly refers to margin and settlement payments "arising out of commodity contracts, forward contracts,

or securities contracts." *Id.* Since the exchanges of stock for money resulted in a transfer of securities, the fact that the payments had been made in the context of an LBO (and even directly to stockholders who tendered their shares) was irrelevant. *Id.* at 1240–41. Rather, transfers that settle and clear through a standard securities settlement system satisfy "the strictest notion of 'settlement payment'" under section 546(e), which is "a notion tied to the clearance and settlement system." *Id.* at 1240 n. 10.

Shortly after *Kaiser I* and *Kaiser II* were decided, the Ninth Circuit followed suit in *Comark. See Jonas v. Resolution Trust Corp. (In re Comark)*, 971 F.2d 322 (9th Cir.1992) ("*Comark*"). In that case, Comark and GreatAmerican Federal entered into and then cancelled a securities transaction. Comark returned to GreatAmerican Federal the $9.25 million worth of securities that were "additional margin" for the deal. *Id.* at 323, After Comark declared bankruptcy, its trustee argued that the dealer's unwinds were "unusual," so the return of the securities could not "be considered 'normally' part of a settlement payment." *Id.* at 326. The Ninth Circuit flatly rejected this argument, explaining that "a settlement payment [under Section 741(8)] clearly includes a transfer of securities that completes a securities transaction .... [which] includes *any transfers* that occur during the settlement process." *Id.* (emphasis added). The court concluded that the return of the customer's collateral "was a transfer of securities necessary to complete the transaction." *Id.* Therefore, it could be considered a "settlement payment" as a matter of law.

Earlier this year, the Sixth and Eighth Circuits weighed in on the same question. First, in *Contemporary Industries Corp. v. Frost*, 564 F.3d 981 (8th Cir.2009), the Eighth Circuit held that payments by or to a financial institution for privately-held stock acquired during the course of a leveraged buyout were "settlement payments" within the plain meaning of Section 546(e). The court explained that the term "settlement payment" under Section 546(e) had a "sufficiently plain and unambiguous meaning" that "was intended to sweep broadly." *Id.* (citing cases).

A few months later, in *QSI Holdings, Inc. v. Alford*, 571 F.3d 545 (6th Cir.2009), the Sixth Circuit adopted the holding in *Contemporary Industries* that transfers made to holders of nonpublic securities, as part of an LBO, were entitled to the benefit of the safe harbor. *See id.* at 550–51. As the court explained, although the context of the transaction was unusual because nonpublic securities were involved, the transaction bore certain similarities to a "common leveraged buyout," and the language of the statute did not indicate that Congress intended to limit its applicability to publicly traded securities. *Id.* at 550.

While every Circuit Court of Appeals that has considered the question has uniformly defined "settlement payments" expansively, a handful of district and bankruptcy courts have declined to extend the section 546(e) safe harbor to purely private securities transactions that do not involve a financial intermediary. *See, e.g., Kapila v. Espirito Santo Bank*, 374 B.R. 333, 345–46 (Bankr.S.D.Fla.2007) (direct purchase of stock from shareholders in LBO); *Norstan Apparel Shops, Inc. v. Lattman*, 367 B.R. 68, 77 (Bankr.E.D.N.Y.2007) (same); *Zahn v. Yucaipa Capital Fund*, 218 B.R. 656, 676 (D.R.I.1998); *Jewel Recovery L.P. v. Gordon*, 196 B.R. 348, 353 (N.D.Tex. 1996) (same); *Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655, 664–65 (N.D.Ill.1991) (same). To the extent that these decisions even discuss transfers in

the context of ordinary course transactions, the holdings in these cases do not hinge upon any such observation. Rather, each of these courts concluded that transactions that do not involve a financial intermediary do not implicate the kinds of concerns about the stability and integrity of the securities markets that section 546(e) was enacted to protect. *See Kapila,* 374 B.R. at 345–46; *Norstan,* 367 B.R. at 77; *Zahn,* 218 B.R. at 676; *Jewel Recovery,* 196 B.R. at 353; *Wieboldt,* 131 B.R. at 664–65. Since a financial intermediary and a broker/financial institution were involved in the Redemptions, the key consideration that caused these courts to conclude that payments were not "settlement payments" (the absence of any financial intermediary) is not present here.

Accordingly, the relevant case law is either neutral or counsels in favor of interpreting the 546(e) safe harbor as reaching transactions beyond the ordinary course.

## B. The Rule of the Last Antecedent

■ Conventions of statutory construction support reading section 546(e) as not limited to ordinary course transactions. As this Court explained in *JPMorgan Chase Bank N.A. v. Baupost Group, LLC,* 380 B.R. 307 (S.D.N.Y.2008), where, as here, no contrary intention appears, the "rule of the last antecedent" provides that a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows. *Id.* at 319. The Supreme Court has stated that it is "quite sensible as a matter of grammar" to construe statutes in conformity with the rule of the last antecedent. *See Nobelman v. Am. Savings Bank,* 508 U.S. 324, 330, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

In *Barnhart v. Thomas,* 540 U.S. 20, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003), Justice Scalia explained the rule of the last antecedent by analogy:

Consider, for example, the case of parents who, before leaving their teenage son alone in the house for the weekend, warn him, "You will be punished if you throw a party or engage in any other activity that damages the house." If the son nevertheless throws a party and is caught, he should hardly be able to avoid punishment by arguing that the house was not damaged. The parents proscribed (1) a party, and (2) any other activity that damages the house. As far as appears from what they said, their reasons for prohibiting the home-alone party may have had nothing to do with damage to the house—for instance, the risk that underage drinking or sexual activity would occur. And even if their only concern was to prevent damage, it does not follow from the fact that the same interest underlay both the specific and the general prohibition that proof of impairment of that interest is required for both. The parents, foreseeing that assessment of whether an activity had in fact "damaged" the house could be disputed by their son, might have wished to preclude all argument by specifically and categorically prohibiting the one activity—hosting a party—that was most likely to cause damage and most likely to occur.

*Id.* at 27–28, 124 S.Ct. 376.

■ Applying this grammatical precept to the statutory language at issue in this case, the limiting phrase—"commonly used in the securities trade"—cannot be read to modify anything other than the last antecedent that precedes it—"other similar payment." *See* 11 U.S.C. § 741(8), Thus, "settlement payment" as that phrase is defined in section 741(8), is not limited to "payments commonly used in the securities trade." *See id.* Rather, the phrase "settlement payment," as used in section

546(e), includes any payment in settlement of a securities transaction.

Interpreting the language of the Bankruptcy Code according to the rule of the last antecedent also preserves the intent of the statute's drafters. In 1982, Congress broadened the scope of the safe harbor, in part to capture transactions *"beyond* the ordinary course of business." *Kaiser I*, 913 F.2d 846, 849 (10th Cir.1990) (emphasis added, footnote omitted). There is no compelling reason to torture grammar in this case in order to reach a result that appears to undermine the intent of Congress.

For the above reasons, this court reverses the holding of the Bankruptcy Court insofar as it limited the definition of settlement payment—and restricted the availability of Section 546(e)'s safe harbor from avoidance—to payments "commonly made" in the securities trade (i.e., made in connection with ordinary course securities transactions).

### III. The Payments At Issue are Settlement Payments within the meaning of the Safe Harbor

▮ Although the term "securities transaction" does not appear in either sections 546(e) or 741(8), Enron notes (correctly) that courts generally agree that "settlement payments" subject to the safe harbor are payments made in the context of a "securities transaction." (Appellee's Br. at 11 (citing cases).) Enron argues that, regardless of whether the definition of "settlement payment" is restricted to ordinary course transactions, the early redemption of its commercial paper in this case was not a "settlement payment" subject to the safe harbor because the redemption was not a "securities transaction" as purportedly required by the Bankruptcy Code. (*Id.*) To qualify as a "securities transaction" for purposes of the

safe harbor, Enron contends that (i) the commercial paper at issue in this case has to meet the definition of a "security" under Section (3)(a)(10) of the Securities Exchange Act of 1934 (the "1934 Act")—and it argues that the notes here at issue do not (*id.* at 24–25), and/or (ii) the underlying transaction has to involve the "purchase or sale" of a security—and it appears that this transaction did not (*id.* at 11–12). Judge Gonzalez appears to have assumed that the notes evidencing Enron's debt were securities, but he concluded that there was no qualifying securities transaction because no purchase or sale had occurred—only a payment of debt.

This court rejects both of Enron's arguments.

### A. The Plain Language of the Bankruptcy Code Reaches Commercial Paper

Commercial paper is included in the definition of "security" under the Bankruptcy Code. Specifically, a security is defined, *inter alia*, as a "note," "stock," "treasury stock," "bond," "indenture," "collateral trust certificate," "pre-organization subscription or certificate," "transferable share," "voting-trust certificate," "certificate of deposit," or a "certificate of deposit for security." 11 U.S.C. § 101(49)(A)(i)-(xi). This definition is significantly broader than that codified in the 1934 Act, which does not reach commercial paper with a maturity date of less than nine months. *See* 15 U.S.C. § 78g.

Enron does not dispute that the short-term notes at issue fall within the Bankruptcy Code's definition of "securities." However, Enron (citing no authority) urges this Court to discard the Bankruptcy Code's definition of "security" and instead apply the definition found in the 1934 Act. (Appellee's Br. at 24–25.) Courts interpreting section 546(e)'s reach,

however, have routinely rejected this argument, and have applied the Bankruptcy Code's definition of security under section 101(49) in deciding whether the safe harbor applied. *See, e.g., In re Grafton Partners, L.P. v. Circle Trust F.B.O.*, 321 B.R. 527, 531–32 (9th Cir. BAP 2005) (membership interest in an LLC is a security); *Crown Paper Co. v. Fort James Corp.*, No. 02 Civ. 3838, 2006 WL 2348850, at *5 (N.D.Cal. Aug. 11, 2006) (a note is a security). This Court will do likewise.

## B. The Payments At Issue Were Made to Consummate Securities Transactions, And Are Therefore Settlement Payments

Having disposed of the red herring about securities, we reach the ultimate question: were the payments to Alfa and ING that Enron seeks to avoid "settlement payments"? At first blush, it would seem that they are: the court in *Kaiser I* ruled that anything that may be considered a settlement payment fell within the four corners of the statute, 913 F.2d at 848, and the confirmations issued to Alfa and ING explicitly referred to the "settlement date," suggesting an industry understanding that payments made and received on that date were "settlement payments."

Nonetheless, Judge Gonzalez concluded that they were not. *Enron II*, 407 B.R. at 45. He ruled as a matter of law that a securities transaction had to involve a "purchase or sale" that resulted in the transfer of title—and he held, as a matter of ostensibly undisputed fact, that there was neither a purchase nor a sale because

Enron never acquired title to the notes. *Id.* In pronouncing his holding in *Enron II*, Judge Gonzalez did not address the text of the trade confirmations, presumably because in *Enron I*, he had already rejected any suggestion that they were relevant. As he explained in the earlier case, the confirmations "were created by the defendants [appellants] without any input or ratification by Enron, [Therefore,] Enron cannot not be bound, on a substantive basis, by the descriptions of the transactions contained in the Confirmations." *Enron I*, 325 B.R. at 683 n. 6. I find that reasoning singularly unpersuasive.[1]

If there is any single disputed issue of fact in this case, it is whether Enron "acquired title" to the notes. Alfa and ING—and the SEC—insist that title did pass, and that the transaction by which the notes were redeemed meets any purchase and sale requirement the law might impose. *See, e.g.,* SEC Mem. at 9–11; Appellee's Br. at 6. Resolution of that dispute, however, appears to require resort to evidence that goes far beyond the parameters of this narrow appeal.[2]

But there is no need to remand this case to the Bankruptcy Court for resolution of whatever dispute exists concerning "purchase" and "sale." This Court concludes that because the redemption of the notes (a security) involved "the delivery and receipt of funds and securities," *Kaiser I*, 913 F.2d at 850 (*quoting National Securities Clearing Corp.*, 42 Fed.Reg. 3916, 3920 n. 56 (1977)), it qualifies as a "securities transaction" for safe harbor purposes,

1. The confirmations were not concocted by Alfa and the other noteholders to bolster a litigation position they could not possibly have imagined they would need to take; rather, they represent the security industry's understanding of the nature of the transaction and the payments.

2. Based on this Court's review of the record on this appeal, it appears that there is far more of a disputed issue of fact concerning the intricacies of the passage of title to the now-extinguished notes than there could possibly be over the role of JP Morgan as agent or principal in connection with the redemption of the debt securities.

regardless of whether Enron, itself or through an agent, acquired title to the notes.

### 1. The Redemption of the Notes was a "Transaction" in Securities

A settlement payment is any transfer that concludes or consummates a securities transaction. *Kaiser I*, 913 F.2d at 849: *see also Comark*, 971 F.2d at 325; *Contemporary Industries*, 564 F.3d at 986; *accord Jackson*, 263 B.R. at 475. Although the court in *Kaiser I* derived this simple definition from securities industry publications that refer primarily to payments made to complete a trade, later courts (including, significantly, the Tenth Circuit) have pointed out that the Bankruptcy Code contains no such limitation. *See, e.g., Kaiser II*, 952 F.2d at 1238–39; *Lowenschuss*, 181 F.3d at 516; *Comark*, 971 F.2d at 325–26. These courts have held that such transactions as the return of a customer's collateral, *Comark*, 971 F.2d 322, and payments received in the context of an LBO, *see, e.g., Kaiser II*, 952 F.2d 1230; *Lowenschuss*, 181 F.3d 505, meet the definition of "securities transactions."

Enron does not dispute that a settlement payment is one that concludes a "securities transaction." But it argues that the term "securities transaction" encompasses only purchases and sales. This is no more cogent a contention than the argument that settlement payments are limited to payments made to conclude ordinary course transactions.

Both Webster's and Black's define the word "transaction" in extremely broad terms. Black's Law Dictionary explains that a "transaction" is: "The act or instance of conducting business or other dealings"; "Something performed or carried out; a business agreement or exchange"; and even more broadly as "Any activity involving two or more persons." *Black's Law Dictionary* 1535 (8th ed.1999). Likewise, Webster's states that a "transaction" is, in relevant part, "something that is transacted, esp. a business agreement," and further defines "transact" as "to carry on or conduct (business negotiations, etc.) to a conclusion or settlement." *Webster's College Dictionary* 1415 (1991). Neither dictionary confines the term (used, as here, in its business sense) to business dealings that involve purchases and sales. The redemption of debt is a "transaction" (as that term is commonly used) in which the debtor pays what he owes and the holder of the evidence of the debt tenders that evidence back. If, as was the case here, the evidence of indebtedness is a security, it would seem beyond cavil that the redemption of the debt was carried out by means of a "transaction" in a security.

However, Enron argued—and persuaded Judge Gonzalez to agree—that a qualifying securities transaction had to involve a purchase or sale in which title to the security passed from one party to the other. In explaining his ruling, Judge Gonzalez relied upon a forty-year-old Second Circuit decision (authored by the revered Judge Henry Friendly) that interpreted the term "purchase" as used in the Investment Company Act of 1940 (the "ICA"). *Enron II*, 407 B.R. at 38 (*quoting SEC v. Sterling Precision Corp.*, 393 F.2d 214 (2d Cir.1968)). Appellants submit, and I agree, that this reliance is misplaced.

In *Sterling Precision*, the Second Circuit was confronted with the task of deciding whether a corporation's discharge of a bond or debenture—its redemption of a debt security—qualified as a "purchase" of a security within the meaning of the ICA, *Sterling Precision*, 393 F.2d at 217. The Court of Appeals concluded that the redemption and discharge of a debt security was not a "purchase" of that security be-

cause, "when an entity discharges a bond or debenture, it does not acquire title to it." *Sterling Precision*, 393 F.2d at 217. In other words, it held that the "purchase" of a security required the passage of title to the security. *Sterling Precision*, 393 F.2d at 217.

Judge Gonzalez' reliance on *Sterling Precision* is understandable. None of the cases interpreting the scope of section 546(e)'s safe harbor deals with the precise fact pattern confronting us here—the redemption of debt instruments—but *Sterling Precision* did involve the redemption of debt instruments, albeit in a non-bankruptcy context. Furthermore "Congress has made clear that [section 546(e) and accompanying provisions] are to be defined with reference to the common understanding, practice and usage in the securities industry." *Jackson v. Mishkin*, 263 B.R. 406, 475 (S.D.N.Y.2001). The securities laws, and their interpretations, are thus a natural and logical place to turn for definitions of terms within the Bankruptcy Code that are otherwise undefined.

But the Supreme Court has counseled against overreliance on the definition of a term for purposes of one statute when interpreting another. For example, in *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), the Justices were called upon to determine whether certain demand notes issued by a fanning cooperative were "securities" within the meaning of the Securities Exchange Act of 1934. Rejecting the approaches adopted by the Eighth and District of Columbia Circuits, the Court explained that the definition of "investment contract" under Section 2(1) of the Securities Act of 1933 (the "1933 Act") did not meant that a "note" was a "security" under an entirely different scheme—Section (3)(a)(10) of the 1934 Act. *Id.* at 64, 110 S.Ct. 945. Instead, the Court adopted the "family resem-blance" test articulated by (ironically) Judge Friendly in another case, *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126 (2d Cir.1976), It held that a "note" would be a "security" only if it were sufficiently akin to other types of securities the Securities Exchange Act sought to regulate—notwithstanding any competing or nominally relevant definitions codified in other areas of the securities laws. *Id.* at 1137–38.

The Supreme Court's cautionary language about statutory "borrowing" is instructive here. The overlapping subject matter between the various laws designed to regulate securities does not confer judicial license to treat requirements under different statutory schemes employing alternate sets of statutory language as interchangeable.

In *Sterling Precision*, the Court of Appeals was not grappling with an issue relevant to this appeal. It was trying to decide whether the redemption of a debt security involved the "purchase" of that security. *See Sterling Precision*, 393 F.2d at 217. This and all courts in the Circuit are of course bound by Judge Friendly's conclusion that the redemption of a debt security is not a "purchase" of that security for purposes of the Investment Company Act. But Judge Friendly did not decide the question that confronts us here: whether the redemption of a debt security constitutes a "securities transaction" that is consummated by means of a "settlement payment." As pointed out previously, the terms "purchase" and "transaction" are not congruent; the latter is far broader than the former. The logical fallacy in Enron's argument is thus laid bare.

Enron insists, however, that two of my colleagues have previously concluded that a securities transaction consummated by a section 546(e) settlement payment must include a purchase and/or sale, I do not

read the cases Enron cites as holding any such thing.

Enron's citation to Judge Scheindlin's opinion in a related adversary proceeding, *Enron Corp. v. J.P. Morgan Sec., Inc.*, 388 B.R. 131 (S.D.N.Y.2008), is completely off the mark. In that opinion, Judge Scheindlin denied a motion to withdraw the reference in this and the related adversary proceedings involving Enron's effort to avoid the debt redemption payments. She made no ruling on any of the substantive issues addressed here; she made no substantive ruling at all. As for Judge Scheindlin's passing statement that, "[T]he safe harbor provision only applies to qualifying purchases and sales of securities," it is found in a section of her opinion entitled "Procedural History," in which she summarized the basis of Judge Gonzalez's ruling in *Enron I*. *Id.* at 133–36. Any "ruling" in the statement quoted by Enron was made by Judge Gonzalez, not by Judge Scheindlin.[3]

Enron also points to *Jackson v. Mishkin*, 263 B.R. 406 (S.D.N.Y.2001) (Marrero, J.), for the proposition that courts in this district have interpreted the term "settlement payment" for section 546(e) purposes to encompass only transactions involving the purchase or sale of securities. (Appellee's Br. at 12.) Again, its reliance is misplaced.

In *Jackson*, Judge Marrero wrote that "the term 'settlement' as commonly used in connection with purchases and sales in the securities trade refers to acts that occur at different sta[g]es of the process towards completion of the securities trans-

action." *Jackson*, 263 B.R. at 475. But while those words appear in the opinion, Judge Marrero did not conclude that a purchase or sale was necessary before a payment could be deemed a "settlement payment" and avoided under section 546(e). Instead, Judge Marrero held that certain transfers of non-existent or sham assets "either did not constitute qualifying 'payments' or did not contemplate consummation of a *bona fide* securities 'settlement' in the relevant sense of these words." *Id.* at 480 (emphasis added).

Critical to Judge Marrero's holding in *Jackson* was the fact that the purported "transfers" in the case before him were made in connection with wholly phantom securities transactions. Hanover Sterling & Co., a brokerage firm that was technically in violation of its net capital requirements, concocted a scheme to avoid the inevitable negative consequences by recording wholly fictitious purchases of stocks in various customer accounts. *Id.* This deceived both regulators and Hanover's clearing broker, Adler, Coleman Clearing, into thinking that the firm was actually in compliance with its net capital requirement. *Id.* at 420–21, 440. At the last moment before the business failed, Hanover booked phantom purchases of Blue Chip stocks in the accounts of certain of these customers—either insiders or persons whom Hanover brokers hoped to retain as customers when they landed new jobs. *Id.* at 421–22. Its intent was to maximize those customers' claims under the Securities Investor Protection Act (SIPA) in the inevitable liquidation.

---

**3.** In the same opinion, Judge Scheindlin stated, again in passing, that Goldman Sachs—who, along with JP Morgan and Lehman, actually obtained the notes from their holders and paid the holders the money Enron now seeks to claw back—was acting as the agent for Enron during the redemption transaction. *See Enron Corp. v. J.P. Morgan Sec., Inc.*, 388

B.R. 131, 140 (S.D.N.Y.2008). As Enron has consistently taken the position that there at the very least a disputed issue of fact concerning the agency status of the three investment banks, I very much doubt that it would argue to Judge Gonzalez that Judge Scheindlin's dictum had resolved that question against its position.

Adler, Coleman went under shortly after Hanover closed, and in an ensuing proceeding brought by the Securities Investor Protection Corporation (SIPC), its trustee sought to avoid and recapture the money it had paid to settle these "trades" as fraudulent transfers under 11 U.S.C. § 548. *Id.* at 417–23. A group of investors who had benefited from the trades argued that the payments made by Adler, Coleman were "settlement payments," and so could not be avoided. Judge Marrero disagreed. *Id.* He concluded that payments made to "settle" phony transactions would not normally be regarded in the securities trade as part of the settlement process, because they were "so steeped in fraud." *Id.* at 481.

Interestingly, Judge Marrero announced that he was departing from the plain language of the Bankruptcy Code, which might well otherwise shield the transfers from avoidance, to reach his conclusion. To my learned colleague, the unique—not to say criminal—circumstances of the case justified a ruling that appeared to him not to comport with the literal language of the statute. *Id.* at 479. Nothing in the record before me suggests that similar considerations would pertain here.

Indeed, on the facts of this case, I can see no cogent policy reason to depart from the literal language of the Bankruptcy Code. The basis for my conclusion can be found in Judge Marrero's scholarly opinion.

In *Jackson,* Judge Marrero surveyed dozens of cases analyzing whether transactions fell within the section 546(e) relating to the safe harbor. He identified five key factors that bear on whether the safe harbor applies to a particular transaction. *Id.* These include:

(1) the transactions have long settled by means of actual transfers of consideration, so that subsequent reversal of the trade may result in disruption of the securities industry, creating a potential chain reaction that could threaten collapse of the affected market;

(2) consideration was paid out in exchange for the securities or property interest as part of settlement of the transaction;

(3) the transfer of cash or securities effected contemplates consummation of a securities transaction;

(4) the transfers were made to financial intermediaries involved in the national clearance and settlement system;

(5) the transaction implicated participants in the system of intermediaries and guarantees which characterize the clearing and settlement process of public markets and therefore would create the potential for adverse impacts on the functioning of the securities market if any of those guarantees in the chain were invoked.

*Id.* at 479–80 (citations omitted). Although no higher court has adopted the five *Jackson* factors as a formal "standard" for deciding whether a particular transfer qualifies for safe harbor status, at least one other court in this District has cited with approval to Judge Marrero's codification of relevant considerations. *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 351 F.Supp.2d 79, 107 (Lynch, J.).

This Court agrees with Judge Lynch that the five factors identified by Judge Marrero should be considered in determining the applicability of the safe harbor to any particular set of novel facts, Applying these five factors to the early redemption of Enron's commercial paper, this court is

constrained to conclude that the safe harbor applies.

It is easy to conclude that the third, fourth and fifth Jackson factors are present in this case.

The transfers of cash (to the former noteholders) and securities (the notes that were surrendered) contemplated the consummation of a "securities transaction" as described by the third factor. Under the analysis set forth above, that alone qualifies the transfers as "settlement payments" for purposes of section 546(e)—and distinguishes this case from *Jackson*, where the challenged payments were not made to consummate "bona fide" securities transaction, but rather totally sham transactions. *See Jackson*, 263 B.R. at 480.

Additionally, the transfers were made by and to "financial intermediaries" who are involved in the national clearance and settlement system—namely JP Morgan and Chase IPA—as contemplated by the fourth factor.

Finally, as described in the fifth factor, the Redemption implicated the participants in the system of intermediaries and guarantees that characterize the clearing and settlement process of public markets—notably the DTC. Enron argues that the DTC's role is wholly irrelevant in light of the fact that the agency used only its "bookkeeping functions" rather than its securities "clearance and settlement functions" in connection with the Redemptions. (Appellee's Br. at 6.) However, the SEC— the Executive Branch agency charged with regulating the securities markets—strongly and persuasively disagrees. It points out that "the potential for harm to the clearance and settlement system occurs when a payment made in a previously settled transaction is recovered from a participant. This is so regardless of whether the payment is made in connection with a trading transaction that implicates the guarantees of the clearance and settlement process or a settlement transaction that does not directly implicate the guarantees." (SEC Mem. at 2.)

The first and second Jackson factors warrant only slightly more fulsome discussion.

The first factor is that the transactions at issue have long settled by means of actual transfer of consideration; and the second is that consideration was paid out in exchange for the securities or for a property interest as part of the settlement of the transaction.

It is undisputed that $1.1 billion was actually transferred by Enron to redeem the notes. The money was clearly paid out in exchange for the return of the securities—or, to use the appealingly simple language of *Kaiser I*, there was "the delivery and receipt of funds and securities." 913 F.2d at 850 (citation and internal quotation marks omitted). And as the transfers took place more than eight years ago, they have also been "long settled." *See, e.g., Kaiser II*, 952 F.2d 1230 (7 years, 10 months between challenged transfer and Tenth Circuit decision).

Additionally, the SEC has argued that reversing the $1.1 billion in actual transfers of funds could be acutely disruptive to the affected market, because settlement finality is especially important for "critical financial markets" like that for commercial paper. (SEC Mem. at 3.) Specifically, the SEC explains that the market for commercial paper was designated a "critical financial market" by several entities entrusted with its regulation, including the Federal Reserve and the SEC, in part because of the market's volatility. (*Id.*) That is, "commercial paper is attractive to investors," explains the SEC, "because it is perceived to have very little risk. If settlement payments in commercial paper re-

purchase transactions are subject to avoidance when an issuer becomes bankrupt, investors could well seek to offset the potential risk by requiring higher returns, purchase notes with shorter maturities, or avoiding transactions with certain issuers." (*Id.* at 4.) This is precisely the sort of chain reaction the safe harbor was intended to prevent.

The only other question about the applicability of the first and second Jackson factors turns on the question of whether early repayment of the face amount of a debt instrument, together with accrued interest, constitutes "consideration." Although payment of a preexisting debt does not constitute consideration, repayment of a debt earlier than required constitutes valid consideration. *See generally,* Restatement (Second) of Contracts § 73 (1981). Thus, the early repayment of Enron's notes constituted consideration sufficient to satisfy the first and second factors.

As all five Jackson factors are present in the securities transaction at bar, there is no policy reason to depart from what appears to this Court to be the plain meaning of the literal language of the Bankruptcy Code.

Finally, Enron also commends to the Court's attention two lower court cases from other districts, *Crown Vantage, Inc. v. Fort James Corp.,* No. 02 Civ. 3838, 2006 WL 2348850 (N.D.Cal. Aug. 11, 2006), and *Langenkamp v. Moore,* 75 B.R. 840 (Bankr.N.D.Okla.1987). It argues that both decisions support its position that the section 546(e) safe harbor is limited to the "purchase and sale" of securities and therefore "does not apply to payments that retire a debt instrument." (Appellee's Br. at 12, 17–18 (citations omitted).) I have reviewed those non-binding decisions from sister districts and do not find them particularly helpful.

*Langenkamp* involved the interpretation of a different set of statutory language. In that case, the defendants, Kenneth and Mary Moore received thrift certificates for Republic Financial Corporation ("RFC") on April 4, 1984. 75 B.R. at 841. A few months later, and within the 90 day period immediately preceding the bankruptcy, RFC transferred to the Moores cash equal to the value of the certificates. *Id.* The trustee, R. Dobie Langenkamp, subsequently sought to avoid the transfer under sections 547 and 550 of the Bankruptcy Code, arguing that the transfer was not shielded from avoidance by the portion of the section 546(e) safe harbor that protects transfers by or to "stockbrokers." 75 B.R. at 845–46.

The Bankruptcy Court for the Northern District of Oklahoma held, in an unpublished decision, that the purchasers of the thrift certificates were not "customers" under section 741(2)(A) of the Bankruptcy Code, *see id.* at 845, so Republic Financial Corporation could not have been a "stockbroker as defined by 11 U.S.C. § 101(46) with regard to its transactions with its creditors," *id.* at 846. The payment provided to the Moores was thus not protected by the 546(e) safe harbor, because the Bankruptcy Code provision on which the Moores relied (section 741) only "govern[ed] the liquidation of stockbroking entities." *Id.* There was no discussion in *Langenkamp* of the scope of the safe harbor in terms of whether it was limited only to securities transactions that constituted purchases and sales; that issue was irrelevant, since the trustee RFC was not a type of institution whose transfers could fall within the ambit of section 546(e).

To say that the *Crown Vantage* court denied "settlement payment protection for a bank loan because it did not involve 'the process of clearing trades'" totally mischaracterizes the holding. (Appellee's Br.

at 18 (citation omitted).) The transfer sought to be avoided in *Crown Vantage* was $484 million in funds consisting of the proceeds of a private bank loan obtained by Crown and the proceeds of a public offering of unsecured senior subordinated notes. 2006 WL 2348850, at *5. These proceeds were aggregated and transferred to an escrow agent, who then transferred the funds to Fort James pursuant to an intercreditor agreement. *Id.* After it filed for bankruptcy, Crown sought to avoid the payments to Fort James, who argued that the payment made to it was a "settlement payment" protected by section 546(e).

First, the court disagreed that transfer of the proceeds from the private bank loan could be protected from avoidance by the section 546(e) safe harbor. It noted that the private bank loan was *neither* "occur[ed] on a 'public market' *nor* 'involve[ed] the process of clearing trades,'" and so could not be considered a "settlement payment." *Id.* However, the *Crown* court held that the 546(e) safe harbor reaches commercial paper, and that "funds raised by Crown through the issuance of notes," which were "publicly sold through underwriters," were "securities transactions" that could qualify for protection under the safe harbor. *Id.* The court ultimately concluded that the money raised in the public offering could be clawed back by the debtor, but only because the "settlement" of each such transaction was "complete, at the latest, when Crown received payment from the issuing underwriters." This meant that the transfer sought to be avoided—the transfer to Fort James, which occurred after the underwriting was complete—was not a payment made to "settle" (conclude) a "securities transaction." *See id.*

The *Crown Vantage* court appears to have made an implicit finding that there was a purchase or sale, since it refers to the notes as having been "sold." But the court never discussed whether there was any "purchase or sale" limitation on securities transactions subject to the safe harbor. *Id.*

In short, none of the authorities on which Enron relies suggests any persuasive reason why transfers made to consummate a "securities transaction" consisting of the redemption and retirement of debt instruments do not qualify as "settlement payments" for purposes of section 546(e). The Court perceives no reason why, either. The transfers fall within the literal language of the statute. They were clearly perceived as settlement payments by the parties to the original transactions; they were consummated using the standard clearing mechanism for transactions in commercial paper, and the documentation that issued at the time described the transactions as settlements of securities trades, referring to them as "purchases" from the holders, and referencing a "trade date" and "settlement date." No criminality or fraud has been suggested; the transactions were not phony or sham. The only issue is whether these transfers can be avoided as preferences because they were made within 90 days of the Chapter 11 filing. Section 546(e) says they cannot be avoided because they are settlement payments, which are payments made in the securities trade to consummate securities transactions. That is the end of the matter,

### CONCLUSION

For the foregoing reasons, the order of the Bankruptcy Court is reversed. As requested, the Court remands to the Bankruptcy Court with instructions that summary judgment be entered in favor of Alfa and ING.

This constitutes the decision and order of this Court.